Filed 8/20/15

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| FLUOR CORPORATION, | ) | |
| | ) | |
| Petitioner, | ) | S205889 |
| | ) | |
| v. | ) | |
| | ) | |
| THE SUPERIOR COURT OF | ) | |
| ORANGE COUNTY, | ) | Ct. App. 4/3 G045579 |
| | ) | |
| Respondent; | ) | |
| | ) | |
| HARTFORD ACCIDENT & | ) | |
| INDEMNITY COMPANY, | ) | |
| | ) | Orange County Super. Ct. |
| Real Party in Interest. | ) | No. 06CC00016 |
| _____ | ) | |

We granted review to consider whether Insurance Code section 520 — a statute tracing back to 1872, which was not cited to or considered by this court when we decided *Henkel Corp. v. Hartford Accident & Indemnity Co.* (2003) 29 Cal.4th 934 (*Henkel*) — changes our determination in that case regarding the enforceability of "consent to assignment" clauses in third party liability insurance policies. Under *Henkel*, the consent-to-assignment clause contained in the insurance policy in the present case would permit the insurer, after a loss has occurred, to refuse to honor an insured's assignment of the right to invoke the policy coverage for such third party losses attributable to past time periods for which the insured had paid premiums. We conclude that Insurance Code section 520 dictates a result different from that reached in *Henkel*, and accordingly we overrule the decision in *Henkel* to the extent it is inconsistent with the views expressed in the present opinion.

1

*Henkel,* like the present case, concerned an insured's assignment of the right to invoke defense and indemnification coverage under a liability policy issued by real party in interest Hartford Accident & Indemnity Company (Hartford). We held in *Henkel* that the consent-to-assignment clause was enforceable and precluded the insured's transfer of the right to invoke coverage without the insurer's consent even *after* the coverage-triggering event — like here, a third party's exposure to asbestos resulting in personal injury — had already occurred. Specifically, we determined in *Henkel* that when a liability insurance policy contains a consent-to-assignment clause an insured may not assign its right to invoke coverage under the policy without the insurer's consent until there exists a "chose in action" against the insured, which we found in *Henkel* occurs only when the claims against the insured have "been *reduced to a sum of money due or to become due* under the policy." (*Henkel, supra*, 29 Cal.4th at p. 944, italics added.)

The statute that was not cited to us or considered in *Henkel*, Insurance Code section 520 (hereafter sometimes section 520),[1] specifically restricts an insurer's ability to limit an insured's right to transfer or assign a claim for insurance coverage. As discussed *post*, part III.B., section 520 bars an insurer, "after a loss has happened," from refusing to honor an insured's assignment of the right to invoke the insurance policy's coverage for such a loss. Fluor Corporation (which, for reasons explained below, we will refer to as Fluor-2 in its post-2000 incarnation) contends that when an assignment takes place, as here, after a third party's exposure to asbestos resulting in personal injury for which the insured may be potentially liable, "a loss has happened" within the meaning of section 520 and an insurer cannot thereafter rely on a consent-to-assignment clause in a liability insurance policy to avoid the effect of the assignment. In other words, Fluor-2 asserts that, by virtue of section 520, under such circumstances an insured's assignment of the right to invoke coverage is

---

[1] All future undesignated statutory references are to the Insurance Code unless otherwise indicated.

2

effective without the insurer's consent *despite* the existence of a consent-to-assignment clause, contrary to this court's decision in *Henkel.*

The Court of Appeal below rejected Fluor-2's contention, concluding that section 520 does not apply to liability insurance. The appellate court further suggested that even assuming the statute applies to such policies, it should be construed to reflect the same rule that we articulated in *Henkel* and not the view advanced by Fluor-2. Hartford concurs with the appellate court on both points. As explained below, we disagree with the Court of Appeal on both issues. In light of the relevant language and history of section 520, we conclude the statute applies to third party liability insurance, and that, properly construed in light of its relevant language and history, section 520 bars an insurer from refusing to honor an insured's assignment of policy coverage regarding injuries that predate the assignment. It follows that the decision in *Henkel*, which assessed the proper application of a consent-to-assignment clause *under common law principles*, cannot stand in view of the contrary dictates of the controlling statutory provisions of section 520.

As further explained below, the rule embodied in section 520 is consistent with the overwhelming majority of cases decided before and since *Henkel.* The principle reflected in those cases — precluding an insurer, after a loss has occurred, from refusing to honor an insured's assignment of the right to invoke policy coverage for such a loss — has been described as a venerable one, borne of experience and practice, facilitating the productive transformation of corporate entities, and thereby fostering economic activity.

For these and related reasons set out below, we will reverse the decision of the Court of Appeal.

## I. *Facts and Procedure*

For many decades the original Fluor Corporation performed engineering, procurement, and construction (EPC) operations through various corporate entities and subsidiaries. Beginning in 1971, Hartford became one of numerous insurers of the original

3

Fluor, issuing to it 11 "comprehensive general liability" (CGL) policies from mid-1971 to mid-1986.[2]

Each policy covered, among other things, "personal injury liability." In that respect Hartford agreed "[t]o pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of personal injury, sustained by any person and caused by an *occurrence*." (Underscoring omitted, italics added.) "Occurrence" is defined in the policies as "an accident, including injurious exposure to conditions, which results, during the policy period, in bodily injury or property damage neither expected nor intended from the standpoint of the insured." (Underscoring omitted.) As noted, each of the policies contains a consent-to-assignment clause reading: "Assignment of interest under this policy shall not bind the Company until its consent is endorsed hereon."

A. *The asbestos lawsuits*

The original Fluor Corporation operated at sites where asbestos allegedly was used. Beginning in the mid-1980s and continuing until the present, various Fluor entities were named as defendants in numerous lawsuits alleging liability for personal injury caused over many preceding years by exposure to asbestos. Currently, Fluor entities are facing approximately 2,500 such suits in California and elsewhere.

Fluor Corporation tendered these early suits to Hartford and its other liability insurers, all of which subsequently accepted the defense of the claims. Hartford led the defense and settlement of those actions — ultimately expending and paying, over the course of more than 25 years, millions of dollars in the defense and indemnity of those actions.

---

[2] Under each policy, Hartford contracted to provide insurance to every entity in Fluor's corporate family of EPC companies. The "named insured" under the Hartford policies is identified as "FLUOR CORPORATION and any subsidiary or affiliated companies, corporations, organizations or other entities as may exist or may be formed or acquired hereafter," with the exception of a small number of subsidiaries that were expressly excluded from certain provisions under each policy.

B. *Fluor's acquisition and spinoff of A.T. Massey*

During the 1980s, the original Fluor Corporation acquired A.T. Massey Coal Company — a mining business outside Fluor's core EPC operations — and A.T. Massey became a subsidiary of Fluor. A.T. Massey's mining operations were conducted and managed independently of Fluor's EPC operations.

In 2000, Fluor decided to refocus on its core EPC businesses, and to separate those operations from the A.T. Massey coal mining operations. Fluor's goal was to "maintain the basic corporate structure, ownership, management, brand recognition and continuing operations of the EPC companies, while preserving the value of A.T. Massey's business [and several long-term mining leases] for shareholders."

Fluor decided to undertake a corporate restructuring and tax-free stock distribution known as a "reverse spinoff." Accordingly, in mid-September 2000, Fluor incorporated a newly formed subsidiary with no prior corporate existence, which the parties (and we as well) refer to as Fluor-2 — an entity that would retain the name "Fluor Corporation" so as to acknowledge continuation of the company's longstanding EPC businesses. As reflected in a "Distribution Agreement" dated late November 2000, the original Fluor changed its name to Massey Energy Company. At that same time, the original Fluor transferred all of its EPC-related assets and liabilities to Fluor-2, thereby making Fluor-2 the parent of the EPC subsidiaries. The new Massey Energy Company retained A.T. Massey's coal mining and related businesses. The Distribution Agreement described the business of each entity and the parties' intent to "allocate and transfer [the] assets and allocate and assign responsibility for [the] liabilities in respect of activities of the business of such entities." In article V, section 5.01 (titled "Asset Transfers"), the Distribution Agreement provided that the original Fluor "shall transfer, assign and convey *any and all* rights and/or obligations it may have to [Fluor-2] with respect to . . . all Parent Assets and Parent Liabilities *except*" for certain listed assets — various specified investments, accounts, and intellectual property rights.

5

(Italics added.)  The agreement did not except any insurance rights from this otherwise broadly phrased transfer of "any and all" assets.[3]

As previously mentioned, such a transaction is known as a reverse spinoff.  It is reverse in the sense that, instead of spinning off the subsidiary — A.T. Massey — from the original Fluor, that original corporation took on the name and operations of its subsidiary, and became Massey Energy Company.  At the same time, a new company, Fluor-2, was formed, retaining the name and operations of the original Fluor Corporation.

According to Fluor-2, the transition of the original Fluor's EPC operations was seamless and caused no discernable impact on the customers, employees, or creditors of the original and subsequent corporations.  After the reverse spinoff, Fluor-2 operated as the continuation of the original Fluor Corporation's EPC business, openly claiming that it was vested with all the assets — including the insurance policies, under which it regularly sought and was afforded defense and indemnification coverage — and obligations (including liability relating to the asbestos suits) arising from the EPC business.  Fluor-2 asserts that in conducting the same EPC business under the Fluor Corporation name, it was treated as the accounting successor to the original (pre-spinoff) Fluor for financial reporting purposes.   Fluor-2 also used the same stock symbol (FLR), was owned by the same shareholders, was managed by the same executive team, was headquartered in the same location, and retained all of the books, licenses, permits, contracts and agreements associated with the original Fluor Corporation's EPC business.

C. *Notification of the spinoff, and continuing coverage by Hartford*

In May 2001, approximately six months after the reverse spinoff, Fluor-2 sent Hartford a letter providing copies of its annual report and a November 2000 letter and

---

[3]     The parties contest whether this provision in the Distribution Agreement constituted an assignment of claims regarding benefits under the insurance policies.  This issue is not before us and remains an unresolved issue of law and fact.  (See *post*, fn. 18.)

"Proxy Statement/Information Statement" to shareholders regarding the separation of Fluor-2 and Massey Energy Company.[4] Fluor-2's letter to Hartford summarized the reverse spinoff as follows: "On November 30, 2000, Fluor Corporation was separated into two publicly traded companies, 'New Fluor' and 'Massey Energy Company.' Fluor Corporation changed its name to Massey Energy Company. Fluor Corporation distributed to its shareholders shares of New Fluor Common Stock, which represents a continuing interest in Fluor Corporation. 'New Fluor' is a newly created entity named Fluor Corporation that was incorporated on September 11, 2000."

It is undisputed that after the reverse spinoff, and consistent with the open-ended nature of "occurrence-based" liability insurance policies (which provide coverage for claims stemming from events occurring during the policy period, even if the claim is presented long after the policy expires; see, e.g., *Montrose Chemical Corp. v. Admiral Ins. Co.* (1995) 10 Cal.4th 645, 664 (*Montrose*)), Hartford continued for approximately seven years to defend Fluor-2 against claims triggered by occurrences during the terms of the original Fluor's long-expired policies, and provided defense and indemnity payments concerning those claims on Fluor-2's behalf. Although Hartford had, between 2001 and 2008, occasionally disclaimed defense and indemnification coverage concerning specific companies or subsidiaries that it asserted did not qualify as insureds under its policies, during this period Hartford raised no objection based on the reverse spinoff to coverage for third party liability claims presented by Fluor-2. From 2002 until 2008, during the same time it defended the asbestos suits and provided indemnification, well after the reverse

---

[4]    The statement in turn included as an appendix an undated copy of the previously mentioned Distribution Agreement.

spinoff, Hartford continued to collect from Fluor-2, as the claimant, nearly $5 million in "retrospective premiums."[5]

D. *Hartford's request for a declaration that it has no obligation to defend or indemnify Fluor-2 because Hartford did not consent to the assignment of claims for coverage under the liability policies*

Although there had been no dispute regarding Hartford's general duty to defend and indemnify with regard to the asbestos suits, various ancillary questions arose concerning the scope of Hartford's coverage obligations under the liability policies. As a result, Fluor-2, in an action that raised numerous issues not before us now, sued Hartford in February 2006, seeking declaratory relief on behalf of itself and its insured subsidiaries. In response, Hartford filed a second amended cross-complaint in mid-2009, presenting for the first time the allegations underlying the current proceedings. Hartford asserted that *assuming* the original Fluor Corporation had attempted to assign its insurance coverage claims to Fluor-2, the original corporation had failed to comply with the consent-to-assignment provision found in each policy. Specifically, Hartford alleged that the reverse spinoff reflected a "*purported* assignment of insurance rights under the Distribution Agreement" to Fluor-2, and because this was done without Hartford's consent, no effective assignment of the right to invoke coverage under the policies occurred. (Italics added.) Based on these allegations, Hartford sought a declaration that it has no obligation to defend or indemnify Fluor-2. On the same grounds, Hartford also asserted unjust enrichment and sought reimbursement of the defense and indemnity payments that it had already made on behalf of Fluor-2.[6]

---

[5] These payments became chargeable under the "retrospective premium" provision of some of the policies after Hartford made defense or indemnity payments on behalf of the claimant, Fluor-2.

[6] As explained below, Hartford now claims that the only entity that can obtain defense and indemnification coverage under its old policies is the entity that has succeeded to the new Massey Energy Company — Alpha Appalachia Holdings, Inc., which filed an amicus curiae brief in support of Fluor-2. That entity asserts in its amicus curiae brief that before and during this time Massey Energy Company maintained its own separate insurance

(*footnote continued on next page*)

8

E. *Fluor-2's unsuccessful motion for summary adjudication*

In early 2011, Fluor-2 moved for summary adjudication of Hartford's cross-complaint. Fluor-2 argued that Hartford's claims failed as a matter of law because Insurance Code section 520 by its terms bars enforcement of the policies' consent-to-assignment clauses "after a loss has happened." Fluor-2 asserted the asbestos suits allege that the continuing exposures leading to bodily injury occurred during the terms of the various policies (between 1971 and 1986); the "loss" triggering Hartford's duty to defend and indemnify had already happened; thus, pursuant to section 520, claims concerning insurance coverage for injuries resulting from those occurrences were properly assignable without Hartford's consent; and these claims were assigned to Fluor-2 along with the original Fluor Corporation's other assets in the 2000 Distribution Agreement.

---

(*footnote continued from previous page*)

coverage for its coal operations. Alpha Appalachia Holdings expresses its understanding that "the insurance assets available for the asbestos claims — the right to claim benefits under the Hartford policies for the losses allegedly caused by exposure to asbestos — arose out of the longstanding EPC business, and therefore were intended to belong to Fluor." Alpha Appalachia Holdings also states that "[f]ollowing the Reverse Spinoff, there never has been any dispute between Fluor and Massey regarding Fluor's right to claim the Hartford Policy benefits for the asbestosis liabilities" and that "[c]ontrary to Hartford's inference, Massey does not submit any EPC asbestos-related claims to Hartford for coverage." The brief continues: "To the extent that any claims arising out of Massey's coal mining operations are insured under the Hartford Policies' 'difference in conditions' coverage, Massey pursues coverage from Hartford separately from Fluor, just as A.T. Massey Coal Company did before the Reverse Spinoff." It explains: "The above-described structure ensured that the company responsible for and best positioned to handle and pursue insurance coverage for a long-tail tort liability relating to its historic business — EPC as to Fluor and coal as to Massey — continued to do so following the Reverse Spinoff. Because the asbestos liabilities arise from the EPC business, Fluor seeks coverage for those claims under the Hartford Policies, and neither Fluor nor Hartford has ever requested Massey to participate in the defense of any asbestosis claims, nor has Massey ever had a need to participate in the defense of any asbestos claim."

9

Hartford opposed the summary adjudication motion based on this court's 2003 decision in *Henkel, supra,* 29 Cal.4th 934.  It argued that the superior court was "duty-bound to apply *Henkel*, not [section] 520" of the Insurance Code.

The trial court agreed with Hartford, declining to consider or apply Insurance Code section 520 on the ground that our decision in *Henkel*, *supra*, 29 Cal.4th 934, had definitively addressed and resolved the enforceability of the same consent-to-assignment clause.  It denied Fluor-2's motion for summary adjudication.  Fluor-2 filed a petition for a writ of mandate in the Court of Appeal, seeking to determine whether section 520 or *Henkel* controls in this circumstance.  The Court of Appeal invited Hartford to submit an informal response.  (See *Palma v. U.S. Industrial Fasteners, Inc.* (1984) 36 Cal.3d 171.)  Shortly thereafter the Court of Appeal summarily denied the writ petition.

Fluor-2 then sought review in this court.  We granted the petition and transferred to the Court of Appeal with directions to vacate its summary denial and to issue an order to show cause to respondent superior court.  The Court of Appeal requested full briefing from Fluor-2 and Hartford as real party in interest and heard oral argument.  Thereafter, the Court of Appeal issued a decision denying Fluor-2's petition for writ of mandate.

II.  *The decision in* Henkel*, and*
*the Court of Appeal's decision below*

A.  *The decision in* Henkel

In 1979 an insured entity, Amchem — which had both a metalworking chemical business and an agricultural chemical business — spun off its metalworking line into a separate, newly created corporation, which we called Amchem No. 2.  That subsequent corporation assumed both the assets and the liabilities of the original Amchem insofar as they related to metalworking activities.  A year later, Amchem No. 2 was acquired by and merged into Henkel Corporation.  Subsequently, the original Amchem, which continued its agricultural chemical business, was acquired by another entity, which in turn was later acquired by, and merged into, yet another corporation.  (*Henkel*, *supra*, 29 Cal.4th at pp. 938-939.)

10

In 1989 various workers sued Henkel Corporation and "Amchem" (without distinguishing between the two versions of that corporation), alleging personal injuries arising from exposure to metallic chemicals between 1959 and 1976. Henkel tendered its defense to the insurers of the original Amchem, including Hartford, which refused coverage, relying on the consent-to-assignment clauses in each policy and noting that no insurer had consented to covering Henkel.

After settling with the injured workers, Henkel Corporation sued the insurers of the original Amchem, again including Hartford, asserting that it had acquired a right to coverage under those policies. Because the contract of sale did not expressly purport to assign the right to invoke coverage under the liability policies, Henkel argued first and primarily that such insurance coverage had transferred to it automatically by operation of law. For that proposition, Henkel Corporation relied on a federal decision, *Northern Ins. Co. of New York v. Allied Mut. Ins*. (9th Cir. 1992) 955 F.2d 1353 (*Northern Insurance*).[7]

---

[7] In *Northern Insurance*, a corporation, Brown-Forman, purchased the assets of another corporation, California Cooler. A family filed a products liability suit against Brown-Forman for presale conduct, alleging prenatal injuries from ingestion of California Cooler's products. Brown-Forman sought defense from California Cooler's two insurers — Allied, which had covered California Cooler during most of the claimants' pregnancy, and Northern, which had provided liability insurance for only the last two weeks of the pregnancy. Both agreed to defend, and the claimants eventually dismissed the suit. Northern then sought contribution from Allied for its defense costs. (*Northern Insurance, supra,* 955 F.2d at pp. 1356-1357.)

The federal appellate court in *Northern Insurance* rendered two main holdings: First, it reasoned that under a theory of "product-line successor liability" — and regardless of whether the parties had by contract assigned the right to invoke coverage under the policy — the successor corporation Brown-Forman could claim California Cooler's policy benefits because, the court determined, the rights to indemnity and to a defense "followed the liability . . . by operation of law." (*Northern Insurance, supra,* 955 F.2d at p. 1357.) Second, the court held that the consent-to-assignment clause in the policy could not be enforced by the insurer because the underlying injuries had occurred prior to Brown-Forman's purchase of California Cooler's corporate assets and the resulting automatic (by operation of law) assignment of claims for coverage under the policy. The court reasoned that the rationale for enforcing a consent-to-assignment provision "vanishes when liability arises from presale activity" because "regardless of any transfer the insurer still covers only

(*footnote continued on next page*)

The trial court ruled against Henkel Corporation, but the appellate court reversed. Finding *Northern Insurance* persuasive, it held that whether or not the parties had by contract assigned the rights to invoke coverage under the liability policies along with the liabilities, Henkel Corporation, as the successor entity, had acquired by operation of law both the liabilities of the predecessor *and* the predecessor's right to invoke coverage related to those liabilities. The court also held that the consent-to-assignment clause in the policies could not be enforced because the underlying injuries had occurred prior to the automatic transfer of insurance benefits.

We reversed. (*Henkel*, *supra*, 29 Cal.4th at pp. 943-945.) Addressing the first issue — whether, in the context of a contract that transferred liabilities and assets, but did not specify that rights to assert insurance claims concerning those liabilities were among the assigned assets, rights to invoke that insurance coverage were nevertheless transferred *by operation of law* — we noted that two decisions of California Courts of Appeal disagreed with *Northern Insurance* on that point.[8] We found it unnecessary to resolve that conflict because we determined that Henkel Corporation's liability had in fact been assumed by contract, and not imposed by operation of law.[9] Moreover, we held, "when liability is

---

(*footnote continued from previous page*)

the risk it evaluated when it wrote the policy," and, moreover, the "cooperation clause of the policy" protected the insurer should the assignee "prove a reluctant partner in the defense." (*Id*., at p. 1358.)

[8] See *Quemetco Inc. v. Pacific Automobile Ins. Co.* (1994) 24 Cal.App.4th 494, and *General Accident Ins. Co. v. Superior Court* (1997) 55 Cal.App.4th 1444 (*General Accident*).

[9] We surveyed "three situations in which a buyer of corporate assets may be liable [by operation of law] for the torts of its predecessor, notwithstanding the purchaser's failure to assume liability by contract" (*Henkel, supra,* 29 Cal.4th at p. 941, italics omitted), and found none applicable on the facts. (*Id*., at p. 942.)

assumed by contract, *the successor's rights are defined and limited by that contract*." (*Henkel*, at p. 943, italics added.)

We next addressed Henkel Corporation's alternative argument that the contract had assigned the right to invoke coverage for losses that had already occurred — and that the consent-to-assignment clause in the policies was unenforceable. We rejected the argument, concluding that *whether or not* the parties had effectuated such a contractual transfer, "*any such assignment would be invalid because it lacked the insurer's consent.*" (*Henkel*, *supra*, 29 Cal.4th at p. 943, italics added.)

As noted earlier, the clause in *Henkel* was identical to that in this case, barring " '[a]ssignment of interest under this policy' " absent the insurer's consent. Alluding to decisions enforcing similar "consent-to-assignment" clauses in a different context — purported *substitution* of one insured for another *before* a loss had occurred — we observed in *Henkel* that "[s]uch clauses are generally valid and enforceable." (*Henkel*, *supra*, 29 Cal.4th at p. 943, citing *Bergson v. Builders' Ins. Co.* (1869) 38 Cal. 541, 545 (*Bergson*) [holding such a clause enforceable against assignment of an insurance policy itself, but expressing doubt that such a clause could be enforced regarding assignment, *after* a loss had occurred, of rights to invoke coverage] and *Greco v. Oregon Mut. Fire Ins. Co.* (1961) 191 Cal.App.2d 674, 682 (*Greco*) [holding such a clause enforceable regarding an attempt to substitute one insured for another, by assignment of a policy before a loss has occurred — but noting that it was "settled" that such a clause cannot be enforced to bar assignment, *after* a loss had occurred, of rights to invoke coverage].)[10]

---

[10] In *Greco*, the appellate court observed: "The policy by its own terms, *insofar as it involved the substitution of one insured for another*, was not assignable without the consent of the insurer. Any purported assignment of such a policy without consent is ineffective. [Citations.] *On the other hand, it is settled that the right to recover thereon after loss has occurred is assignable without company consent*. [Citations.] The former situation involves the obligation of the insurance company to indemnify a particular person against loss; the selection of its indemnitee properly is a matter of its own choice. The latter situation involves only the payment of a claim founded upon a loss against which the policy

(*footnote continued on next page*)

13

Consistent with these just-cited cases, Henkel Corporation argued that the right to invoke coverage "under an occurrence-based liability policy . . . *can be assigned without consent once the event giving rise to liability has occurred*." (*Henkel*, *supra*, 29 Cal.4th at p. 944, italics added.)  It contended that under the circumstances presented, there had in fact been an actual, and effective, postloss assignment of the right to invoke coverage.  We rejected that view, concluding that any purported contractual assignment had been ineffective because the matter had not matured into a "chose in action."  (*Ibid*.)

We began our analysis by citing cases upholding assignment of a chose in action, and we highlighted a statement in one of those cases:  " '[A] provision in a contract . . . against assignment does not preclude the assignment of *money due or to become due under the contract . . . .*' "  (*Henkel*, *supra*, 29 Cal.4th at p. 944, quoting *Trubowitch v. Riverbank Canning Co.* (1947) 30 Cal.2d 335, 339-340, italics added.)  From this observation about a circumstance in which a consent-to-assignment clause would *not preclude assignment*, we extrapolated a firm rule about what is required before a claim for insurance coverage may be assigned *notwithstanding a consent-to-assignment clause*:  We held that there must first exist a fixed sum of money due or to become due.  And yet, we observed, the "claims" at issue in the case before us "had not been reduced to a sum of money due or to become due under the policy."  (*Henkel*, *supra*, at p. 944.)[11]  It followed, we found, that "[i]n 1979, when Amchem No. 2 assumed the liabilities of Amchem No. 1, the duty of defendant insurers to defend and indemnify Amchem No. 1 from the claims of the [injured workers]

---

(*footnote continued from previous page*)

indemnifies, and the designation of a payee of such claims properly is a matter left solely to the discretion of the indemnitee, viz., the insured." (*Greco, supra,* 191 Cal.App.2d at p. 682, italics added.)

[11]     We subsequently characterized this same inquiry as whether, "when at the time of the assignment the benefit has been reduced to a claim for money due or to become due." (*Henkel*, *supra*, 29 Cal.4th at p. 945.)

*had not become an assignable chose in action.*" (*Ibid.,* italics added.) Hence, we concluded, Amchem No. 1 could not properly assign its rights to invoke coverage without the insurers' consent. Finally, we also rejected Henkel Corporation's contention that assignment should nevertheless be allowed and enforced, even though the underlying claims had not been reduced to a judgment for sum of money due, because assignment would not impose any material additional risk or burden on the insurer that it did not originally bargain to assume. (*Id.,* at p. 945.)[12]

In a dissenting opinion, Justice Moreno argued that under established common law, " 'assignment is valid following occurrence of the loss insured against' " because such a claim is " 'regarded as [a] chose in action rather than transfer of [an] actual policy.' " (*Henkel*, *supra*, 29 Cal.4th at p. 946 (dis. opn. of Moreno, J.), quoting 2 Couch on Insurance (3d ed. 1997) § 34:25, p. 34-21.)[13]

---

[12]     We reasoned:  "An additional burden may arise whenever the predecessor corporation still exists or can be revived (see *Penasquitos, Inc. v. Superior Court* [(1991)] 53 Cal.3d 1180), because of the ubiquitous potential for disputes over the existence and scope of the assignment.  If both assignor and assignee were to claim the right to defense, the insurer might effectively be forced to undertake the burden of defending both parties.  In view of the *potential* for such increased burdens, it is reasonable to uphold the insurer's contractual right to accept or reject an assignment." (*Henkel*, *supra*, 29 Cal.4th at p. 945, italics added.)  We similarly rejected the argument that "the insurers face no such [actual] dual burden" on the facts presented.  (*Ibid.*)

[13]     Justice Moreno asserted that the majority erred in "narrow[ing] this long-standing rule" by holding that assignment is valid only after a claim against the policy has been " 'reduced to a sum of money due or to become due under the policy.' " (*Henkel*, *supra*, 29 Cal.4th at p. 947 (dis. opn.), quoting maj. opn. at p. 944.)  The dissent also argued that the majority's rule was "predicated on a misconception of when a party has a 'chose in action.' (2 Couch on Insurance, *supra*, p. 34-21.)  The majority equates a chose in action with a claim that has been reduced to a sum of money due or to become due.  Under the majority's view, it seems that a party must file a claim, and this claim must result in a legal finding of liability, for a chose in action to lie." (*Id.*, at p. 948 (dis. opn.).)  Instead, the dissent argued, a chose in action in such circumstances should be viewed more broadly:  "A claim need not have been filed, or a judicial determination made, for there to be a chose in action.  Instead, only a right to recover need exist. (See, e.g., *Krusi v. S.J. Amoroso Construction Co., Inc.* (2000) 81 Cal.App.4th 995, 1003 [equating a chose in action with a

(*footnote continued on next page*)

15

B. *The Court of Appeal's decision applying* Henkel

In the appellate court below, Fluor-2 observed that *Henkel* was decided without considering section 520 — which, as discussed *post*, part III.B., by its terms bars enforcement of consent-to-assignment clauses "after a loss has happened." Fluor-2 asserted that the *Henkel* court's unawareness of this provision undermines the precedential authority of that case. The appellate court rejected this argument.

The Court of Appeal began its discussion of the statute by contrasting "first party" insurance policies[14] with "third party" liability policies.[15] It asserted that whereas the

(*footnote continued from previous page*)

right to bring a lawsuit].)" (*Ibid.*) The dissenting opinion argued that "under the policies at issue in this case, a chose in action is established on the date of the *injury*, which is when the *loss* occurs. Therefore, the policy benefits become assignable without the consent of the insurer on the date of the injury, not, as the majority contends, when a claim for this injury has been reduced to a sum of money due or to become due." (*Ibid.,* second italics added.) Finally, the dissenting opinion advanced numerous specific criticisms of the majority's analysis. (See *Henkel*, *supra*, at pp. 950-953 (dis. opn. of Moreno, J.).)

[14]   "If the insurer's performance of its duty to pay runs directly to the insured for indemnifying the insured's direct loss, then the insurance classification is called 'first-party insurance.' The insurance benefit (the policy's financial proceeds) is paid to the insured to rectify the insured's actual loss. [One] may accurately regard all forms of insurance (except liability insurance and perhaps uninsured motorists coverage) to be first-party insurance. . . . [¶] The classic example of first-party insurance is property insurance. In first-party property insurance, the damage to the insured's property (. . . your house or your airplane) is an *immediate, direct diminution of the insured's assets*. The insurance proceeds are then paid by the first-party insurer directly to the insured to redress ('indemnify') the insured's actual, direct loss. The goal and purpose of all first-party coverages such as property is to reimburse the insured for the insured's actual property loss (restoration, dollar for dollar) but generally no more." (1 Appleman on Insurance 2d (Holmes ed. 1996) § 3.2, pp. 342-343 (Appleman on Insurance).)

[15]   "Liability insurance is customarily described and classified as third-party insurance because the liability insurer's duty to pay runs not directly to the insured but directly (on the insured's behalf) to a third-party claimant who is injured by the insured's conduct." (1 Appleman on Insurance, *supra,* § 3.3, p. 349.) In this setting, "the insured's loss is 'indirect' and the third party's loss is 'direct.' The liability insurer reimburses

(*footnote continued on next page*)

16

concept of "loss" was easily understood and applied in the context of first party insurance policies, the same concept is problematic in the context of third party liability policies. The court asked, "Does liability insurance provide protection for the 'loss' sustained by insureds" only after insureds "are subjected to a judgment for money damages"? Or is loss triggered "much earlier" — at the time "when the victim of the insured's conduct sustains bodily injury or property damage?" The court suggested that if it were to find section 520 applicable to third party liability insurance, it would construe loss as happening only later, upon a finding of liability or imposition of a judgment — and not earlier, when the original injury or damage first occurred. But ultimately the court avoided deciding that and related questions because, it reasoned, the statute's history showed that the Legislature intended the provision would apply only in the context of first party insurance policies, and not to third party liability policies such as those at issue in this case and in *Henkel*.

The Court of Appeal wrote: "Insurance Code section 520 was first enacted in 1872 as Civil Code section 2599. The provision was recodified verbatim as Insurance Code section 520 when the Insurance Code was enacted in 1935. (Stats. 1935, ch. 145, p. 510.)"[16] The court stated that upon adoption of the underlying statute in 1872, "liability insurance did not even exist as a concept." Indeed, the appellate court maintained, "[a]bout this definitional question" concerning loss in Civil Code, former section 2599, the predecessor to section 520, "the 1872 Legislature cared not a whit. To the 1872 Legislature,

---

*(footnote continued from previous page)*

('indemnifies') its insured for the insured's indirect loss, but payment in practical effect runs directly to the third-party claimant. The liability insurer essentially reimburses its insured for any liability it may have to the third party by paying the third party on the insured's behalf and benefit. The insured is only a conduit for transferring the insurance proceeds from the liability insurer to the third party." (*Ibid*.)

[16] In minimizing the 1935 enactment by asserting that it was a verbatim recodification, the appellate court erred — see *post*, footnote 24, and related text.

the idea of third party liability insurance was as alien as other yet unborn developments, like the Internet . . . ."

The appellate court acknowledged Fluor-2's arguments that when the Legislature recodified a version of the original 1872 statute in 1935 in the course of creating the Insurance Code, and then amended that same section in 1947, the effect was to create a general rule that covered both first party insurance *and* third party liability insurance. The court dismissed both points. It concluded that enactment of the Insurance Code in 1935 "was not intended to effectuate a substantive change in the law" — in other words, it was not intended to acknowledge or reflect any expansion of the predecessor statute's reach to additionally cover third party liability insurance.[17] The court also implied that the 1947 amendment was simply irrelevant.

The Court of Appeal concluded: "Here is the nub. The 1872 Legislature drew no bright lines and made no controlling pronouncements about liability insurance, or about how 'loss' in the context of such policies is to be defined. We see nothing in Insurance Code section 520 or in *Henkel* to support Fluor-2's assumption that the Supreme Court would have reached a different result had the parties in that appeal briefed or argued the statute's applicability. In the absence of an express legislative directive, stare decisis controls. [¶] If Fluor-2 wants to recast the 1872 statute to account for the evolution of modern liability insurance policies . . . it should direct its attention to the Legislature. . . . If the rule of law in *Henkel* is to be vitiated, the Legislature in the 21st century, not the Legislature in the 19th century, must do it."[18]

---

[17]    In support, the court cited section 2 of the 1935 legislation (Stats. 1935, ch. 145, § 2, p. 496), which provides: "The provisions of this code in so far as they are substantially the same as existing statutory provisions relating to the same subject matter shall be construed as restatements and continuations thereof, and not as new enactments."

[18]    The Court of Appeal further found that there existed a " 'fact intensive inquiry' " concerning whether the original Fluor had intended to assign to Fluor-2, or actually did assign, its rights to claims under the insurance policies. And yet, the appellate court

(*footnote continued on next page*)

Fluor-2 again filed a petition for review with this court, seeking to resolve the parties' dispute concerning the applicability of section 520. We granted the petition.

### III. *Analysis*

#### A. *Does section 520 apply to third party liability insurance?*

As recounted above, the Court of Appeal found that section 520 applies only in the context of first party insurance — not to cases, like the present one, involving third party liability insurance. On this key threshold question, we disagree with the appellate court. Although it is unlikely that the Legislature contemplated liability insurance in 1872 or for years thereafter,[19] as explained below, by 1935, when section 520 was adopted — and especially by 1947, when that section was significantly amended — third party liability insurance had become prevalent and well developed. Moreover, by then it had become clear that the provision's coverage was not restricted to first party policies, and did indeed also regulate third party liability policies.

#### 1. *Enactment of the Insurance Code, including section 520, in 1935*

The California Code Commission was established in 1929 to reconfigure the state's existing four codes (the Civil, Criminal and Political Codes and the Code of Civil Procedure), and existing general statute laws, into newly formulated discrete codes — including an Insurance Code. (Stats. 1929, ch. 750.) The preface to the proposed Insurance

---

(*footnote continued from previous page*)

concluded, given its determination regarding section 520, "[t]hese mixed questions of law and fact remain with the trial court and are unaffected by our opinion in this writ proceeding."

[19] Liability insurance was first issued in the United States in 1886. (2 Dunham, The Business of Insurance (1912) pt. IV, Liability Insurance, ch. 43, Historical Sketch, p. 191.) It did not exist prior to then because, until the United States Supreme Court allowed such insurance in *Phoenix Ins. Co. v. Erie Transportation Co.* (1886) 117 U.S. 312, it was considered to be against public policy, and illegal, to insure against one's own negligence in tort.

Code explained that "the effort has been primarily to *recognize the existing situation in the insurance business* by first setting forth the *provisions governing the law and business as a whole*, [and] thereafter segregating provisions governing particular classes of insurance and insurers . . . ." (Proposed Insurance Code (Sept. 20, 1934) p. v, italics added.)[20]  The resulting code was and remains organized in three principal divisions, with division 1 addressing "General Rules Governing Insurance," division 2 dealing with "Classes of Insurance," and division 3 concerning the "Insurance Commissioner."  The statute at issue here, section 520, is located in the general rules division.

Although the appellate court below downplayed the scope and extent of the 1935 Legislature's creation of the Insurance Code, as explained below it is clear that in enacting the code the Legislature actually revised the law relating to insurance.  Indeed, the Legislature described its work as "[a]n act to establish an Insurance Code, thereby consolidating and *revising the law* relating to insurance principles, practice and business matters incidental thereto, and to repeal certain acts and parts of acts specified therein." (Stats. 1935, ch. 145, p. 496, italics added.)  One fact of the "existing situation in the insurance business" (Proposed Insurance Code, *supra*, p. v) that confronted the California Code Commission by the early 1930s was that third party liability insurance — in essence, protection against tort suits — had developed into a commonplace form of coverage.[21]  As

---

**20**     In recommending the code to the Legislature, the commission acknowledged the assistance of a "working conference" in "improve[ing] the form and draftsmanship" of the provisions, without whose insurance expertise the commission "would not have the assurance which it has in recommending this code for adoption." (Report of the Cal. Code Commission (1935) p. 11.)

**21**     See Hawes, *Law of Liability Insurance* (1898) 6 Am.Law. 247, (describing four general types of liability policies, all amounting to "an indemnity against liability" under which "[t]he insurance company puts itself in the position of the assured to the extent of the amount of the policy, and defends any action brought against the assured").  The California Legislature in 1907 listed liability insurance as one of "thirteen kinds" of insurance. (Former Pol. Code, § 594, "part eighth", added by Stats. 1907, ch. 119, § 1, p. 142 ["Liability insurance, including all insurance against loss or damage resulting from accident

(*footnote continued on next page*)

explained *post*, part III.B.2., beginning in the mid-1890s, nationally recognized out-of-state decisions addressed and resolved various questions relevant to the issues presented here concerning liability policies. In 1919, the California Legislature enacted a statute, one of the first of its kind in the country, regulating third party liability insurance.[22] By 1920 there were 20 discrete forms of third party liability insurance (Cornelius, Third Party Insurance (1920) 64, 65), and this general type of insurance became only more widely employed in the next decade. (Vance, Handbook of the Law of Insurance (2nd ed. 1930) pp. 912-918 [describing the forms of liability policies in common use].) Moreover, by the early 1930s it was noted that, with regard to liability policies, "in general, the same doctrines of law apply as in other branches of insurance law." (Long, Richards on the Law of Insurance (4th ed. 1932) p. 885.)

These and other extensive developments in the landscape of insurance law were in turn reflected in the code commission's — and subsequently, the Legislature's — treatment of the new Insurance Code. Both entities reevaluated key statutory provisions, revised some, eliminated some, and added others under the code's newly organized division 1, which, as noted, sets out "General Rules Governing Insurance" and includes section 520, the statute here in question.

Some of the changes made by the Legislature and reflecting general rules of liability insurance include the following revisions: (1) The statute that had been Civil Code former section 2533 — which previously listed the five "most usual kinds of insurance," was recodified as new Insurance Code section 100, and amended to include 20 classes of

---

(*footnote continued from previous page*)

to or injury, fatal or non-fatal, suffered by an employé or other person for and which the insured is liable."].)

[22]     The statute required that each such policy allow a direct action by an injured party against the insurer in the event of insolvency or bankruptcy of the insured, even though the injured party would be a stranger to the insurance policy. (Stats. 1919, ch. 367, § 1, p. 776.)

21

insurance — including, as number 8, liability insurance. (2) The Legislature repealed section 594 of the former Political Code, which had, since 1907, listed "liability insurance" among the various forms of insurance, and replaced it with new Insurance Code section 108, defining such a policy as including "insurance against loss resulting from liability for injury . . . suffered by any natural person . . . ." (3) The Legislature added two wholly new sections to the code: Insurance Code section 5, providing that "the general provisions hereinafter set forth shall govern the construction of this code"; and section 37, providing that only if a particular class of insurance is addressed specifically by statute will the general provisions relating to insurance not apply.[23] (4) Finally, in addition to creating this structure and these provisions, the California Code Commission and then the Legislature also slightly changed the wording of what became Insurance Code section 520,[24] the statute we focus upon now — revealing that specific attention was paid to that particular provision.[25]

When viewed together with the other developments and changes described above, it appears that the Legislature in 1935 intended section 520 would apply generally to *all* classes of insurance — which, as noted, it had recognized, in then newly enacted sections 100 and 108, specifically included liability insurance.

---

[23]     Similarly, the Legislature recodified what had been Civil Code former section 2534, as new Insurance Code section 41, and changed it to provide that "[a]ll insurance in this State is governed by the provisions of this code."

[24]     Civil Code former section 2599, as adopted in 1872, read: "An agreement made before a loss, not to transfer the claim of a person insured against the insurer, after the loss has happened, is void." The corresponding language of Insurance Code section 520, as proposed by the commission and adopted by the Legislature in 1935, reads (changes are shown in strikeout and underscoring): "An agreement ~~made before a loss,~~ not to transfer the claim of ~~a person~~ the insured against the insurer~~,~~ after ~~the~~ a loss has happened, is void if made before the loss."

[25]     In addition, the 1919 direct-action statute (*ante*, fn. 22), was incorporated into the Insurance Code as section 11580 (see Stats. 1935, ch. 145, p. 716), and exists today in substantially similar form.

## 2. *Amendment of section 520 in 1947*

The 1947 amendment to Insurance Code section 520, the only amendment to date, provides further evidence that the statute applies to third party liability insurance. By 1947, liability insurance had become even more common,[26] including CGL policies such as the one at issue in this case, covering all risks *except* those specifically excluded.[27] In that year the Legislature changed section 520 to exempt two specific types of insurance policies — life and disability — from its coverage, and to provide distinct assignment rules for those types of policies. (Stats. 1947, ch. 904, p. 2103.)[28]

In light of this history, as amicus curiae Insurance Commissioner observes, the Legislature's exemption of life and disability insurance (see *ante*, fn. 28) — but not liability insurance — from the reach of section 520 is significant because "it confirms that the Legislature viewed section 520 as a 'General Rule' covering all classes of insurance, even those not specifically identified by the 1872 Legislature."[29] Moreover, the 1947

---

[26] See, e.g., 7 Appleman, Insurance Law and Practice (1942) sections 4251-4255, 4261, 4269-4271; Couch, Cyclopedia of Insurance Law (1929 & 1945) section 1165.

[27] CGL policies had evolved into a standardized form in 1941 and by 1943 had become widely used. (See, e.g., Sawyer, *Liability Insurance, The Inside* (1941) 42 Best's Fire & Cas. News 18 [observing that CGL insurance "has been used in this country for a dozen or so years"]; Sawyer, Comprehensive General Liability Insurance (1943) pp. 19-25 [describing adoption of standardized CGL provisions]; see generally Anderson et al., Insurance Coverage Litigation (2004 supp.) § 1.02, pp. 1-8 through 1-9 [referring to standardized CGL policy revisions in 1943 and 1947].)

[28] The amendment accomplished two related things: It added to the existing language of section 520 (see *ante*, fn. 24) the phrase, "except as otherwise provided in Article 2 of Chapter 1 of Part 2 of Division 2 of this code"; and it amended section 10129 in the cited Article 2, to clarify that policy provisions barring or conditioning assignment of certain kinds of life and disability policies are indeed enforceable.

[29] As observed earlier, Civil Code former section 2533 originally listed the five "most usual kinds of insurance" — and did not include disability or liability insurance — both of which, as mentioned above, were added to the Legislature's expanded list of classes of insurance in 1935. (See § 100.) As the Insurance Commissioner explains: "The fact that

(*footnote continued on next page*)

amendment, which specifically identified the *sole* two exemptions to section 520 (and then dealt separately with assignments of those types of policies — see *ante*, fn. 28), triggers the well-established rule that "if exemptions are specified in a statute, we may not imply additional exemptions unless there is a clear legislative intent [to do so]." (*Sierra Club v. State Bd. of Forestry* (1994) 7 Cal.4th 1215, 1230.) And yet, as the Insurance Commissioner notes, the appellate court below, by finding section 520's general rule inapplicable to liability insurance, improperly did just that.[30]

For all of these reasons, we reject the threshold conclusion of the Court of Appeal, and hold that section 520 applies not only to first party policies, but also to third party liability policies.

---

(*footnote continued from previous page*)

the Legislature in 1947 went through the trouble of exempting disability insurance from section 520, even though it was not a usual kind of insurance in 1872, shows that the Legislature intended section 520 to broadly cover all classes of insurance, regardless of whether they were specifically referenced by the 1872 Legislature."

[30] A final factor informs our determination. As Fluor-2 observes, another statute with a pedigree similar to section 520 is section 533 (previously Civ. Code, former § 2629), which precludes insurance coverage for a "loss caused by the willful act of the insured." The key clause of that venerable statute has not changed since 1872, and yet it has long been held to apply equally to third party liability insurance as well as to the other forms of first party insurance that were common in 1872. (*Arenson v. Nat. Automobile & Cas. Ins. Co.* (1955) 45 Cal.2d 81, 84 [§ 533 "codifies the general rule that an insurance policy indemnifying the insured against liability due to his own wilful wrong is void as against public policy"]; *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18 [under § 533 "the insurer may not provide coverage for willful injuries by the insured against a third party"].) In rejecting a contention that section 533 did not apply to liability policies, the appellate court in *Evans v. Pacific Indemnity* (1975) 49 Cal.App.3d 537, briefly reviewed the history of the 1872 and 1935 legislation, and noted that section 533 "has remained unamended in the succeeding years. *In this long span of time, many changes have taken place in types and forms of insurance and the Legislature was aware of these. Having made no changes to the law in question, the Legislature obviously intended it to continue to apply . . . ."* (*Evans v. Pacific Indemnity, supra*, at p. 541, italics added.)

B. *How does section 520 apply in the context of third party liability insurance?*

In determining the proper interpretation of Insurance Code section 520 in the context of liability insurance, we begin with the statutory language. " 'As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose.' [Citation.] 'We begin with the plain language of the statute, affording the words of the provision their ordinary and usual meaning and viewing them in their statutory context, because the language employed in the Legislature's enactment generally is the most reliable indicator of legislative intent.' [Citations.] The plain meaning controls if there is no ambiguity in the statutory language. [Citation.] If, however, 'the statutory language may reasonably be given more than one interpretation, " ' "courts may consider various extrinsic aids, including the purpose of the statute, the evils to be remedied, the legislative history, public policy, and the statutory scheme encompassing the statute." ' " ' [Citation.]" (*People v. Cornett* (2012) 53 Cal.4th 1261, 1265.)

Section 520 provides: "An agreement not to transfer the claim of the insured against the insurer after a loss has happened, is void if made before the loss except as otherwise provided in Article 2 of Chapter 1 of Part 2 of Division 2 of this code." As alluded to earlier, the exception referred to in the concluding clause of section 520 concerns life insurance and disability insurance, neither of which is involved in this case. Consequently, the relevant language of section 520 provides that an agreement not to transfer a claim of an insured against an insurer "after a loss has happened, is void if made before the loss." The controversy at this stage of the analysis concerns the meaning of the phrase "after a loss has happened" as used in the statute.[31]

---

[31] The statute's opening language, "An agreement not to transfer the claim of the insured against the insurer . . . ," covers an agreement restricting the insured's authority to assign the right to assert, against the insurer, claims for defense and indemnification coverage concerning third party losses. For simplicity, in this opinion we generally refer to this as an agreement restricting assignment of the insured's right to invoke coverage. We

(*footnote continued on next page*)

The phrase "after a loss has happened" is ambiguous when viewed in the context of liability policies.  It could refer, as Fluor-2 asserts it should, to the time period after the injury (loss) to a third party has happened — an occurrence for which the insured may be potentially liable, and for which the insured obtained and paid for liability coverage.  As applied to this case, Fluor-2 argues, loss "happened" after a third party's exposure to asbestos resulted in bodily injury between mid-1971 and mid-1985.  Thereafter, it asserts, in late 2000 the original Fluor Corporation had the authority, without the consent of the insurer, to assign its right to invoke defense and indemnification coverage under its third party liability policies for personal injuries that had occurred during the policy periods.

On the other hand, the statutory phrase "after the loss has happened" could refer, as Hartford asserts it should, not to the event leading to the underlying bodily injury, but instead to a much later point in time — to the period after the insured has incurred a direct loss by virtue of the entry of a judgment, or finalization of a settlement, fixing a sum of money due on a claim against the insured by a person or entity injured by the insured.  Indeed, Hartford and its amicus curiae Stonewall Insurance Company argue that in this sense the common law, section 520, and *Henkel* are all consistent — i.e., they assertedly *all* condition assignment of claims for coverage under a third party liability policy without the insurer's consent on there first being a fixed sum of money due from the insured to the injured third party.

As a matter of linguistics, either interpretation of the phrase "after the loss has happened" is not unreasonable.  In order to decide which is the most reasonable interpretation, we examine the legislative history of section 520 to determine whether it

(*footnote continued from previous page*)

further observe that this statutory language also covers the situation we addressed in *Comunale v. Traders & General Ins. Co.* (1958) 50 Cal.2d 645, 661-662, in which we upheld assignment of an action for breach of contract (wrongful failure to settle a claim).

sheds light on the purpose of the statute and on which interpretation of the term will best effectuate that purpose.

We begin by observing that the sole published opinion citing section 520 addressed the provision in the context of first party insurance only (*Gillis v. Sun Ins. Office, Ltd.* (1965) 238 Cal.App.2d 408, 415), and did not consider what the provision means by the word "loss." Secondary sources have, since 1924, cited, quoted and paraphrased section 520, both in its predecessor and current form, emphasizing its rule that after a loss, an insured's claim regarding insurance benefits may be transferred without the consent of the insurer — but these sources similarly shed no appreciable light on the meaning of the statute or the phrase "after the loss has happened."[32]

In advancing their competing views concerning the provision's language, the parties and their amici curiae rely initially on the history of the predecessor statute — Civil Code former section 2599 — enacted in 1872, and old decisions from New York and California, relating to and *preceding* that statute, addressing assignability of rights to invoke coverage in the context of first party insurance. We turn first to these sources.

1. *The 1872 statute and the preceding decisions from New York and California*

a. *Adoption of the Civil Code and the predecessor statute in 1872*

We begin by focusing on adoption of the Civil Code in 1872. The Legislature had before it a report prepared in 1871 by the California Code Commission, Revised Laws of the State of California (hereafter Proposed Revised Laws (1871)). The commission prefaced its

---

[32] (See 14 Cal.Jur. (1924) Insurance, § 86, p. 532 & fn. 12 [citing and quoting Civ. Code, former § 2599]; 28 Cal.Jur. (1956) Insurance, § 350, p. 41 & fn. 12 [citing and quoting § 520]; Cal. Real Property Sales Transactions (Cont.Ed.Bar 1981) § 10.12, p. 591 [citing § 520 for the proposition that the "requirement of the insurer's consent to an assignment does not apply to assignments after loss; any right of the insured to insurance proceeds resulting from loss may be assigned without the consent of the insurer"]; Cal. Real Property Sales Transactions (Cont.Ed.Bar 2d ed. 1993) § 11.44, p. 750 [same]; Cal. Real Property Sales Transactions (Cont.Ed.Bar 3d ed. 2005) § 12.98, p. 997 [same].)

27

recommendations by observing that the majority of California's existing statutes "have been taken, from time to time, from sister States, and mostly from New York." (Proposed Revised Laws (1871), *supra,* at p. iv.) The commission proposed to continue borrowing, this time from a *draft* New York Civil Code, widely known as the Field Code.[33]

Within the proffered new Civil Code, the commission included former section 2599, tracking verbatim section 1413 of the draft Field Code: "An agreement made before a loss, not to transfer the claim of a person insured against the insurer, after the loss has happened, is void." (Proposed Revised Laws (1871), *supra*, at p. 454.) The draft Field Code had provided the following note concerning this section: "Goit *v.* National Protection Ins. Co., 25 *Barb.*, 189; see Courtney *v.* N.Y. City Ins. Co., 28 *id.*, 116; but see to the contrary, D[e]y *v.* Po'keepsie Mut. Ins. Co., 23 *id.*, 623. Clearly, if this is not now law, it ought to be made such by the legislature. Such a covenant is grossly oppressive." (Draft Field Code, *supra*, at p. 417.)

Our Legislature adopted the proposed Civil Code as recommended, including this provision as section 2599. (Civ. Code (1872) p. 427.) Immediately thereafter, when the commissioners published an annotated version of the new Civil Code, they modified the

---

[33]    The draft New York Civil Code had been circulated in final form a few years earlier by the corresponding Commission for the State of New York. (Commissioners of the Code, The Civil Code of the State of New York (1865) (the draft Field Code).) It was known as the Field Code for David Dudley Field, its chief author and advocate. The California commissioners lauded the draft Field Code as "a monument of legal wisdom and patient industry." (Proposed Revised Laws (1871), *supra*, at p. iv.) They observed that the draft Field Code included "numerous references to leading cases, in which the particular principle declared has been adjudicated," and commended readers to consult a copy of *that* draft annotated code as a means of "testing" the proposed provisions of California's draft code. (*Id.*, at p. v.)

Despite efforts over many decades, the Field Code was never enacted in New York. (Harrison, *The First Half-Century of the California Civil Code* (1922) 10 Cal.L. Rev. 185, 187.) It was, however, adopted in California and four other western states, North Dakota, South Dakota, Idaho, and Montana. (*Ibid.*)

Field Code's note quoted above, and presented it as their own annotation. The case citations remained the same, but the closing text was revised slightly to read: "Clearly, if this was not *the rule of the law prior to the adoption of this Code it ought to have been*; such a covenant or agreement in a policy is grossly oppressive." (Code commrs. note foll. 2 Ann. Civ. Code, § 2599 (1st ed. 1872, Haymond & Burch, commrs.-annotators) p. 152, italics added (Haymond and Burch).) We now review the cited first party insurance cases preceding the 1872 statute.

b.  Goit v. National Protection Ins. Co.

After a fire occurred, the insureds, without obtaining the consent of the insurer, assigned to the plaintiff their right to assert a claim relating to coverage. (*Goit v. National Protection Ins. Co*. (N.Y. Gen. Term 1855) 25 Barb. 189, 190 (*Goit*).) This violated the strict terms of the contract — and indeed, purported to nullify coverage under the policy, which provided that " 'in case of assignment without the consent of the company first obtained, in writing, whether [1] of the whole policy . . . , or [2] *of any claim against said comany* [the insurer] by virtue thereof, either prior or *subsequent to loss or damage* of the property . . . , the liability of the company . . . should henceforth cease.' " (*Id*., at pp. 190-191, first italics added.)

The court in *Goit* held that the insurance policy's prohibition of the first type of assignment — "of the whole policy" — was valid and enforceable. (*Goit, supra,* 25 Barb. at p. 193.) The court explained: "The contract of insurance is one eminently of personal confidence, and the character of the insured forms an important element among the inducements of the underwriters to assume the risk; and hence the provision against assignments of the policy *during the continuance of the risk* is highly beneficial to the insurer." (*Ibid*., italics added.) The court then observed, however, that the policy clause at issue purported to extend this reasonable rule to circumstances in which the loss or damage had already occurred — and all that remained was a claim under the policy against the

insurer. (*Ibid*.) The court rejected that attempted extension, explaining that a contractual prohibition of assignment in *that* setting will be deemed void and not given effect:

"There is certainly not the same reason for prohibiting an assignment *after a loss*, as before. After the loss the confidential relation of insurer and insured no longer exists, but a new relation has arisen out of it, to wit, that of *debtor and creditor*; and it is difficult to see any reason connected either with public policy or the proper rights of the former, why the latter should not be permitted to deal with and concerning this *right in action* as he is permitted to do in respect to any other absolute right, and transfer the same in payment of debts or to meet the other necessities of business." (*Goit, supra,* 25 Barb. at pp. 193-194, italics added.)

### c. Courtney v. N.Y. City Ins. Co.

In *Courtney v. New York City Ins. Co*. (N.Y. Gen. Term 1858) 28 Barb. 116 (*Courtney*), another first party insurance case, following the destruction of personal property by fire, the insured "assigned the claim . . . to the plaintiff by deed duly executed . . . ." (*Id*., at p. 118.) The plaintiff sought to recover the policy's benefits from the insurer, who refused to pay, relying on the policy's clause precluding assignment, either before or after a loss. (*Id*., at p. 117.)

The court wrote: "Whenever the loss occurs and the company have notice and are furnished with the preliminary proofs required by the conditions, *the amount of the loss becomes, by force of the contract, a debt payable to the insured presently or at the time appointed in the policy*. . . . Whenever the right of property in the debt or damages attaches and becomes perfect, all the incidents of property attach also, including the power of sale and disposition. . . . [T]his power of sale and disposition is inseparable from the absolute right of property, and any condition of the kind attached to the sale of real or personal estate, . . . is repugnant and absolutely void." (*Courtney, supra,* 28 Barb. 118, italics added.) Turning to the distinction drawn by the court in *Goit* concerning the two types of assignment scenarios, the court explained: "It is the *policy* of insurance that is not

30

assignable either before or after a loss, without the consent of the insurer. . . . The language of the [consent-to-assignment] condition can have full effect and receive a sensible construction without destroying or impairing the right to recover a debt already accrued. . . . The liability of the company to the holder of the policy is of two kinds, entirely different, and capable of separation; [1] continued liability as assurers, and [2] *liability to pay damages which have accrued*, and the right to which have become perfect. . . . Upon looking at the deed of assignment it will be seen that the subject of it is not the policy of insurance, *but the debt, demand and right of action which had accrued to the assignor* in consequence of the loss by fire." (*Courtney, supra*, at pp. 119-120, italics added.) The court affirmed judgment for the assignee. (*Ibid*.)

d. Dey v. Poughkeepsie Mutual Ins. Co. *and* Bergson v. Builders' Ins. Co.

In the third decision cited in the contemporaneous 1872 annotation concerning the predecessor to Insurance Code section 520, *Dey v. Poughkeepsie Mut. Ins. Co*. (N.Y. Gen. Term 1857) 23 Barb. 623 (*Dey*), the court *enforced*, in circumstances similar to the other cases just discussed, a policy provision barring any assignment without consent. (*Id.*, at pp. 626-627.) As the annotations to both the draft Field Code and the corresponding California Civil Code provision observed, this minority holding — allowing an insurer to veto assignment, after a loss, of a right to invoke coverage under such policies — was "contrary" to the rule expressed in *Goit* and *Courtney*, the draft Field Code, and the enacted language of the California Civil Code provision that preceded section 520.

In *Bergson, supra,* 38 Cal. 541, 544-545, an 1869 first party insurance case that was not cited in the California Code Commissioners' annotation concerning the predecessor to section 520, the insured, prior to occurrence of any loss, made an "assignment of a contingent right to the money" under a fire insurance policy to the plaintiff, Bergson. Without citing *Goit* or *Courtney*, the court nevertheless drew the same distinction articulated in those cases between (1) assigning the contract of first party fire insurance itself with regard to continuing coverage for future events — thereby purporting to substitute one

31

insured for another; and (2) assigning the right to assert a claim for coverage under a first party policy after a loss. The court explained that the first type of transfer could not be undertaken without the insurer's consent, but with regard to the second type, the court found it "doubtful" that an insurer could "restrain . . . assignment." (*Bergson, supra*, at p. 543.) The court observed in this regard: "The insurer has a right to know, and an interest in knowing, for whom he stands as insurer. He may be willing to insure one person and unwilling to insure another, while the owner of a particular parcel of property. He may have confidence in the honesty and prudence of the one in protecting the property and thereby lessening the risk, and may have no confidence in the other. *But these considerations have no application to the assignee of [a claim for coverage under] the policy, for it makes no difference to the insurer to whom he pays the insurance in case of a loss.*" (*Bergson, supra,* 38 Cal. at p. 545, italics added.)[34]

e. *The relevance of this early history and these early cases concerning legislative intent regarding the predecessor to section 520*

Fluor-2 and its amicus curiae[35] emphasize language in *Goit* focusing on the need to protect insurers (and allow enforcement of a prohibition on assignment) "during the continuance of the risk." (*Goit, supra,* 25 Barb. at p. 193.) From this, Fluor-2 extrapolates the following third party liability rule: Once a risk insured against "is realized by the happening of a 'loss' which triggers coverage . . . anti-assignment clauses are deemed to be

---

[34]    Although the latter aspect of the decision in *Bergson, supra*, 38 Cal. 541, amounted to dictum, it has been recognized as a correct statement of law and has been adopted in subsequent cases. (See, e.g., *Greco, supra,* 191 Cal.App.2d at p. 682.)

[35]    In addition to the amicus curiae brief mentioned *ante*, in footnote 6, filed by Alpha Appalachia Holdings, Inc., amicus curiae briefs on behalf of Fluor-2 have been filed by United Policyholders (according to its application, an entity protecting the interests of policyholders); the California Insurance Commissioner; and (in a joint filing) Henry Company LLC (which produces roof coatings and cements, etc.) and Parsons Corporation (providing engineering, construction, technical and management services).

32

an impermissible restraint on alienation prohibited by law." In this way, Fluor-2 reads the predecessor provision, and now section 520, as codifying the rule of the early New York cases: after a loss has occurred, courts will treat as void — and unenforceable — any policy provision purporting to allow the insurer to veto an insured's assignment of the right to invoke defense and indemnification coverage.

By contrast, Hartford and especially its amicus curiae Stonewall Insurance Company (Stonewall)[36] suggests that the early New York cases contemplated that there needed to be a "perfected" and discrete claim before it could be assigned to an entity that was not a named insured. It follows, they suggest, that had the Legislature actually contemplated application of the predecessor to section 520 to liability insurance, it must have intended that such a postloss claim could not be assigned unless the insured's claim has first been reduced to a chose in action, reflected by a judgment or approved settlement for a sum of money. In response, Fluor-2 relies on *Bergson, supra*, 38 Cal. 541, to refute Hartford's assertions that (1) in 1872 the common law required a money judgment before a right to assert a claim for coverage could be assigned, and (2) the Legislature in that year intended to codify any such purported rule.[37]

---

[36]     In addition to Stonewall (according to its application, an insurance company that is regularly involved in insurance litigation in California), Hartford is supported by a joint brief from the Complex Insurance Claims Litigation Association and the American Insurance Association (both self-described as "leading trade associations of major property and casualty insurers that write a substantial amount of insurance in California and nationwide").

[37]     Fluor-2 highlights *Bergson*'s statement that it was "doubtful" whether an insurer could restrain assignment of policy coverage "after the loss occurs." (*Bergson, supra*, 38 Cal. at pp. 543-544.) This, Fluor-2 asserts, coupled with the California Code Commissioners' acknowledgment in their annotation that such a rule, if not "*the rule of law prior to the adoption of this Code,*" it "*ought to have been*" (Haymond & Burch, *supra*, at p. 152, italics added), illustrates the code commissioners' "uncertainty about the state of the law prior to the adoption of this Code," and reflects the "ambiguity in the common law at the time." Indeed, as noted above, one New York case, *Dey, supra,* 23 Barb. 623, disagreed with the other two New York cases. According to Fluor-2, this demonstrates that, contrary

(*footnote continued on next page*)

We note that both *Goit, supra,* 25 Barb. 187, and *Courtney, supra,* 28 Barb. 116, explicitly recognized and sought to protect the insured's need to assign rights to assert first party claims for coverage very soon after manifestation of the loss or damage, and implicitly *rejected* the notion that assignment must await litigation establishing liability or imposition of a judgment.[38]  In our view, these early cases indicate that Civil Code former section 2599 (the predecessor to Ins. Code, § 520) was intended to codify a rule precluding an insurer from prohibiting assignment of an insured's rights to invoke policy coverage in situations in which the insurer's restriction would be — in the words of those cases, the draft Field Code, and the California Code Commissioners — "unjust" and "grossly oppressive," and hence void and unenforceable.  The cases demonstrate that in the first party insurance context, the statute's reference to "after the loss has happened" should be interpreted to apply to the time period immediately after the injury or damage covered by the insurance policy has occurred. Once that loss has happened, the insurer's justification for barring an assignment — that it had evaluated the risks imposed by the *particular* insured and its possessions, and relied on

(*footnote continued from previous page*)

to Hartford's view, the Legislature in 1872 "plainly did not intend to codify an *existing* common law rule with the enactment of Civil Code [former] section 2599" (italics added) — much less one that equated the key phrase "loss happens" with establishment of a money judgment or approved settlement.

[38]     For example, the court in *Goit, supra,* 25 Barb. 187, acknowledged that insureds ordinarily "should *immediately* realize the amount of their insurance, to replace the property destroyed." (*Id*., at p. 194, italics added.)  With this in mind, the court reacted against the prospect of allowing an insurer to frustrate the insured's legitimate interest in receiving rapid recompense:  The court spoke of the insured's right to "anticipate" coverage of a valid claim by assigning a right to assert it, and of precluding the insurer from benefiting from " 'such delays as a litigation will afford' " and " 'the slow result of a lawsuit.' " (*Ibid*.) Similarly, the court in *Courtney, supra,* 28 Barb. 116, sought to prevent an insurer from imposing its will on a "weaker adversary" by forbidding an insurer from blocking "assign[ment] . . . [of the insured's] claim . . . except at the pleasure of the company, *or the worse alternative of a protracted and costly controversy."* (*Courtney, supra,* 28 Barb. at p. 119, italics added.)

that assessment in issuing the policy — is no longer a factor, and the statute provides that the insurer should not be permitted to use its ability to withhold consent to assignment in order to unjustly oppress the insured into accepting an offer from the insurer that is less than the policy promised.

Merely because the phrase "after the loss has happened" has a certain accepted meaning in the first party context, however, does not necessarily indicate that the phrase has the same meaning in the third party liability insurance context. We ultimately conclude that the phrase does have the same meaning in both contexts — but, as explained below, we arrive at that conclusion only after considering the specific circumstances of third party liability insurance in order to determine which interpretation of the statutory language, "after the loss has happened," best serves the statutory purpose in that context.

2. *Subsequent early third party liability insurance cases from various jurisdictions*

Soon after third party liability insurance began to be employed in the years following the late 1880s (see *ante*, fn. 19), there emerged a body of cases addressing key questions specific to that type of insurance that shed light on the issue before us. As we shall see, the common theme animating these pre-1935 cases and statutes was to enable, by various means, indemnity recovery by insureds or their assignees. We first review two developments: cases standing for the proposition that in the liability insurance context, an insured's right to indemnity accrues at the time of the injury or damage; and cases standing for the proposition that an insured may assign its post loss insurance coverage rights.

a. *When does the duty to indemnify under third party liability insurance generally accrue?*

The right to coverage under third party liability insurance includes the right to indemnity. The first set of early liability insurance cases confronted the question of when a liability insurer's obligation arises under a policy to indemnify its insured for loss. (1) Did that duty arise when personal injury or property damage to a third party that was covered by the policy occurred during the policy term, even if the insured had not yet been held liable and, indeed, even if the dollar amount of the liability had not been ascertained until later?

35

Or (2) did the insurer's indemnification duty arise only after the insured incurred an actual monetary loss through a judgment or settlement? These cases answered: the former.

For example, in *American Casualty Ins. Company's Case* (Md. 1896) 34 A. 778 (*American Casualty*), the high court of Maryland addressed consolidated appeals concerning the insolvency of a liability insurer, American Casualty, which had provided coverage against losses by railways arising from property damage or personal injury. The controversy in that case was between two categories of persons who had been injured by the insured during the term of the policy: those who had already obtained a judgment against the insured and those who had not yet had their claims against the insured adjudicated. In rejecting the trial court's conclusion that the former category of claimants had priority over the latter category of claimants, the Maryland Supreme Court explained:

"It is not solely because the insured has actually paid damages that the liability of the insurer to him is fixed, but *it is because an accident or casualty or occurrence has happened for which he is responsible*, and against the loss arising from which he has been indemnified, *that the obligation of the insurer to reimburse him arises, though the precise amount to be paid by the insurer may depend for its ascertainment upon events happening after the insolvency.* In other words, *the contingent liability of the insurer to reimburse the insured becomes . . . fixed . . . the moment an event happens which fastens a responsibility on the insured, if that event be within the terms of the policy; but the amount of the liability continues to be contingent till the precise extent of the demand against the insured is established and paid. This contingency as to amount in no manner derogates from the fact that a liability for some amount has arisen . . . ."* (*American Casualty, supra,* 34 A. at p. 784, italics added; see also *Ross v. American Employers' Liability Ins. Co.* (N.J. 1897) 38 A. 22, 23 (*Ross*) ["in the case of a judgment against the party insured under one of these policies for damages for the result of an accident, *the liability, though legally fixed at that time, relates back to the accident itself. In contemplation of law the insured either was or*

36

*was not, from the first, liable for the consequence of the accident*"].)**39**  This key principle

— that a liability insurer's inchoate obligation to indemnify the insured arises when

personal injury or property damage results during the term of the policy, even though the

dollar amount of the liability continues to be unascertained until later established — was

repeated and applied in subsequent decisions over the following decades.**40**

Although these decisions held that an insurer's duty under a third party liability

policy accrued at the time the third party sustained injury — and not when a judgment was

entered against the insured — they reached that conclusion in a setting unrelated to the

---

**39**     The court in *Ross* noted:  "*In this respect the judgment resembles the proof of loss to be furnished to an ordinary insurer against fire or shipwreck before action [is] brought*, or proof of death in case of life insurance.  These are usually prerequisites to liability to action, but do not constitute the cause of action. . . .  [A]nd the presumption is that the result of an investigation of the facts was never doubtful from the first, and always sure to result according to the actual fact.  So that the recovery of the judgment cannot be held or treated in the law as a contingency which may or may not happen, but a mere judicial ascertainment of the intrinsic character of the occurrence which determined the liability of the insured."  (*Ross, supra*, 38 A. at p. 23, italics added.)  The court concluded:  "This result is the only one which can be counted upon to do anything like justice between the parties."  (*Id*., at p. 24.)

**40**     See, e.g., *Butler Bros. v. American Fidelity Co*. (Minn. 1913) 139 N.W. 355, 358 ("It is not the trial that creates the liability insured against, nor is it the judgment.  Trial and judgment are merely means by which the fact of liability and the amount are determined; the liability being imposed by law at the time of the accident."); *Century Realty Co. v. Frankfort Marine Accident & Plate Glass Ins. Co*. (Mo.Ct.App. 1913) 161 S.W. 624, 630 ("the right of action of the assured did not depend upon judgment first being rendered against it and payment made by it thereof, but . . . its right to the indemnity accrued when the accident occurred for which it was liable"); *Wells v. Guardian Casualty & Guaranty Co*. (Utah 1922) 208 P. 497, 498 (on facts similar to those in *American Casualty* and *Ross,* the court expressly following the "just and equitable" rule of those decisions); *National City Bank v. National Security Co*. (6th Cir. 1932) 58 F.2d 7, 8 (noting, with regard to a requirement of written notice of loss, that it was "settled on the authority of" various cases "that the word 'loss' refers to a condition in which the insured would be subjected to a claim or demand 'out of which a legal liability might arise,' and not to an adjudged liability").

assignment of an insured's rights under a policy. As explained below, however, the next set of early liability insurance cases addressed such assignment issues.

b. *Assignment of rights to invoke liability coverage: Application of the "prior loss" rule in the face of a clause requiring consent of the insurer*

In the late 19th century, the proposition that a consent-to-assignment clause is void and unenforceable with respect to postloss assignment of rights to invoke coverage (see, *ante*, pt. III.B.1.) was quickly and widely embraced as the controlling rule for first party insurance policies.[41] Thereafter, a key federal decision in 1907 extended this rule to postloss assignment of rights to invoke coverage under third party liability insurance.

In *Maryland Casualty Co. of Baltimore, Maryland v. Omaha Electric Light & Power Co.* (8th Cir. 1907) 157 F. 514 (*Maryland Casualty*), the insured, an electric company, held a liability policy covering injury to its employees. The policy contained a consent-to-assignment clause. An injury to an employee occurred, resulting in death. The employee's estate sued the employer and obtained a judgment. The employer, through a reorganization, assigned its assets and transferred its liabilities to a newly incorporated entity, Omaha Electric. After the employee's judgment against the original employer insured became final on appeal to the state supreme court, Omaha Electric, as successor, paid it and sought reimbursement from insurer Maryland Casualty. The insurer denied reimbursement on various grounds, including that (1) it had contracted with only the original employer as insured, and not with Omaha Electric, the assignee; and (2) it had not consented to the assignment. (*Id.*, at p. 515.)

---

[41] See, e.g., *Roger Williams Ins. Co. v. Carrington* (Mich. 1880) 5 N.W. 303, 304 (declining to enforce the clause as "against public policy"); *Alkan v. New Hampshire Ins. Co.* (Wis. 1881) 10 N.W. 91, 95-96 (observing that "[o]nly one case has been cited [the New York decision in *Dey*, *supra*, 23 Barb. 623] (and we have not been able to find another) which sustains such a condition in a policy as valid").

The appellate court in *Maryland Casualty* upheld the postloss assignment, noting that at the time it was made, "the term of the policy had expired, and the character of the [insured] for integrity and prudence, on the strength of which the insurer might have relied in making its contract, could no longer affect its liability. *The recognized reasons for the prohibition of assignments without the consent of the insurer had ceased.*" (*Maryland Casualty, supra,* 157 F. at p. 516, italics added.) The court concluded that the insured's claim, "*like any other chose in action was assignable regardless of the conditions of the policy in question,*" and, commenting that its position was consistent with "the great weight of authority," cited various cases and treatises addressing the issue in the context of first party coverage. (*Ibid.*)

By 1935, when section 520 was enacted, the holding in *Maryland Casualty* had been explicitly followed in various other liability insurance decisions.[42] Indeed, our Court of Appeal, in *Rodgers v. Pacific Coast Casualty Co.* (1917) 33 Cal.App. 70 (*Rodgers*), addressing the propriety of a postloss "assignment of a matured [third party liability] claim against the insurer," observed that the insurer in that case did not even contest the propriety of the assignment to an injured plaintiff. (*Id.,* at p. 72.) Without citing *Maryland Casualty,* the court enforced that assignment in a decision displaying great solicitude for both an injured party and an insured in the face of objections by the insurer. Thereafter this court specifically approved the appellate court's analysis and conclusion in a per curiam opinion issued on denial of hearing in this court. (See *id.,* at pp. 75-76.)

---

[42] See *Garetson-Greason Lumber Co. v. Home Life & Acc. Co.* (Ark. 1917) 199 S.W. 547, 548 (holding that despite a consent-to-assignment clause, a company had a right to assign its claim because "[t]he restriction simply prevented the assignment of the policy during its life, and had no application whatever to the assignment of a liability thereunder"); *Pacific Coast Casualty Co. v. General Bonding & Casualty Ins. Co.* (9th Cir. 1917) 240 F. 36, 41 (noting that a claim under a liability insurance policy was assignable after the loss); see also *Vindicator Consol. Gold Mining Co. v. Frankfort Marine Accident & Plate Glass Ins. Co.* (8th Cir. 1908) 158 F. 1022 (summarily finding the issues identical to those in *Maryland Casualty* and controlled by that authority).

39

Again, although these cases shed useful light, we acknowledge that they involved assignment of an insured's right to obtain the benefits of the insurance policy *after a judgment had been entered against the insured.* Accordingly, these cases did not have occasion to address the issue presented by this case, namely whether the consent-to-assignment clause could validly be applied to preclude the insured from assigning its rights under the policy after the third party had been injured but prior to a judgment or an otherwise matured claim. Such a factual and legal scenario was, however, presented in the next and most relevant out-of-state decision.

3. *The 1939 decision in* Ocean Accident

*Ocean Accident & Guarantee Corp. v. Southwestern Bell Telephone Co.* (8th Cir. 1939) 100 F.2d 441 (*Ocean Accident*), filed just a few years after enactment of section 520 in 1935 — and well before the Legislature's amendment of section 520 in 1947 — involved, as alleged here, assignment by a predecessor company to a successor company of claims regarding coverage provided by a third party liability policy. The Kansas City Telephone Company (Kansas Telephone) sold all of its property, and broadly assigned its assets, rights and liabilities, to Southwestern Bell Telephone Company (Southwestern Bell).[43] One of the seller's assets was its interest in a liability insurance policy issued by its insurer, Ocean Accident, covering " 'accidental bodily injuries sustained by Assured's employees,' " and agreeing to indemnify " 'against loss by reason of the liability imposed by law upon the assured for damages on account of such injuries.' " (*Ocean Accident, supra,* at p. 442.)

One year prior to the sale and assignment, and while the policy was in effect, three employees of the seller, Kansas Telephone, had been injured in separate incidents. After the sale and assignment to Southwestern Bell, the three separately sued that successor company

---

[43] The assignment included " '[a]ll . . . property, rights and assets of whatsoever nature and description, real, personal or mixed, corporeal or incorporeal, legal or equitable, in possession or in expectancy, now owned by the [seller], whether in this conveyance specifically named or not.' " (*Ocean Accident, supra,* 100 F.2d at p. 443.)

for personal injuries.  As in the present case, the suits were commenced both well after the assignment occurred (there, by two to five years) — and long after the liability insurance policy had expired.  Indeed, prior to the assignment, notice had been given to the insurer with regard to only one of the three matters, and, again analogously to the present case, no party to the transaction was even aware of the other two incidents.  (*Ocean Accident, supra,* 100 F.2d at p. 443.)

After receiving notice of the suits, the insurer asserted that it had contracted with Kansas Telephone, not with the successor Southwestern Bell, and it refused to defend. (*Ocean Accident, supra,* 100 F.2d at p. 443.)  Accordingly, the successor itself defended those suits, and then sued the insurer to "recover as damages the expenses so incurred." (*Ibid.*)  The federal court, applying Missouri law, held that the successor corporation "stands in the shoes" of the prior corporation and was entitled to invoke coverage "under the policy as would its assignor." (*Id.*, at p. 445.)

In the course of its opinion, the appellate court rejected two arguments advanced by the insurer.  First, in response to the insurer's contention that it had issued a policy to Kansas Telephone only and that rights to invoke coverage under a liability policy are not assignable, the court in *Ocean Accident* stated:  "It is . . . true that an executory contract in which the personal character of one of the parties is an important element is not assignable without the consent of the parties.  . . . . *But generally, . . . after the event occurs giving rise to the liability the reason for the rule disappears and the cause of action arising under the policy is assignable*." (*Ocean Accident, supra,* 100 F.2d at p. 444, italics added.)

Second, in rejecting the insurer's assertion that coverage under its liability policy was not assignable "because the policy expressly prohibits an assignment without . . . consent" (*Ocean Accident, supra,* 100 F.2d at p. 445), the *Ocean Accident* court relied on *Maryland Casualty, supra,* 157 F. 514, and explained:  "The principle on which the courts hold that an assignment of a right under a policy prohibiting assignment may be made is that *such an assignment is not the assignment of the policy itself* (because the parties have contracted

41

otherwise), *but it is the assignment of a claim, or debt, or chose in action*." (*Ocean Accident, supra*, at p. 446, italics added.) The court then addressed the insurer's observation that *Maryland Casualty* was distinguishable because in that case, "the liability had been liquidated and reduced to judgment before the assignment was made." (*Ocean Accident, supra,* at p. 446.) The court found that factor irrelevant, explaining: "*The question to be determined is when the 'cause of action' arose, whether at the time the accident occurred resulting in damage or after the amount of the loss was liquidated and reduced to judgment against the insured. If it arose at the time of the accident it was assignable notwithstanding the prohibition in the policy against assignments, otherwise it was not.*" (*Ibid.*, italics added.)

The court acknowledged the insurer's argument that "the insured sustained no loss at the time the injury to the employee occurred." (*Ocean Accident, supra,* 100 F.2d at p. 446.) But the court rejected that view, observing that pursuant to the applicable rule, which it found "supported by sound reason and apparently by the weight of authority, . . . under a liability policy such as the one under consideration, *the liability, the loss and the cause of action arise simultaneously with the happening of the accidental injury to the employee.*" (*Ibid.*, italics added.) In support, the federal appellate court cited and described some of the "accrual" cases discussed *ante*, part III.B.2.a. (100 F.2d at pp. 446-447.) It concluded that the successor corporation had properly been conveyed "the right to the protection of the defendant [insurer] against liability on account of injuries to [the three employees] occurring before the date of the conveyance but while the policy was in force; and that such right was an assignable chose in action notwithstanding the prohibition clause in the policy." (*Id*., at p. 447.)

*Ocean Accident* was quickly recognized as a leading case. It was highlighted and analyzed just five months later in a prominent law review (Recent Cases, *Insurance — Employer's Liability Insurance — Liability Policy Held Assignable Without Consent of Insurer Subsequent to Injury to Insured's Employees and Prior to Recovery of Judgment,*

42

*Notwithstanding Provision Requiring Consent* (1939) 52 Harv.L.Rev. 1181, 1181-1182), and within weeks after that it was described and extensively quoted in the insurance industry publication, 8 Ins. Decisions (June 1939) pages 586-588.

Later in 1939, its national influence was confirmed when it was the subject of an annotation, *Assignment by Assured of Policy of Indemnity or Liability Insurance, or of Rights Thereunder* (1939) 122 A.L.R. 144. After setting out the decision in full, the article articulated its understanding of the prevailing rules: Although a consent-to-assignment clause is enforceable before a loss occurs, "[a] different situation arises and a different rule prevails as to assignments made by the assured after the event has occurred by which liability under the policy is fastened upon the insurer. . . . [I]n such cases the assignment, even though it may purport to be of the policy, is in reality, as stated in *Ocean [Accident] . . . an assignment of a claim under, or a right of action on, the policy. Under these circumstances the reasons for regarding the contract as personal have ceased to operate, and it is generally held or assumed that the policy, or rights thereunder, may be assigned, either with or without the consent of the insurer*." (*Id.*, at pp. 145-146, italics added.) Moreover, and significantly, the article stated: "Just what event it is that fixes liability under any particular policy depends of course upon the terms of the policy and the construction given them by the court. *In general . . . ,* as pointed out in *Ocean Acc[ident]. . . , the liability of the insurer, and therefore the right of the assured to assign, arises immediately upon the happening of the accident or other occurrence for which the assured is, or is claimed to be, liable*." (*Id.*, at p. 146, italics added.)

Thereafter, in 1942, *Ocean Accident* was quoted at length and cited in a leading insurance treatise, 7 Appleman, Insurance Law and Practice (1942) section 4269, pages 45-46. A few years later, our Court of Appeal relied on *Ocean Accident* for the proposition that "after a loss has arisen liability is fastened upon the insurer and any right of the insured as a result of the loss may be assigned with or without the consent of the insurer." (*Vierneisel v. Rhode Island Ins. Co.* (1946) 77 Cal.App.2d 229, 232 [approving assignment of a claim

43

under a first party fire insurance policy].)  As this history shows, by the time the Legislature returned its attention to section 520 in 1947,[44] the decision in *Ocean Accident* had become an accepted part of the legal landscape.

4. *The continuing influence of* Ocean Accident *in out-of-state assignment cases*

The rule of *Ocean Accident* — voiding consent clauses as applied to postloss assignment of rights to invoke liability insurance coverage, and imposing no requirement that the matter first be reduced to a sum of money due — continues to be reflected, either explicitly or implicitly, in decisions of the overwhelming majority of courts that have addressed these or similar issues.

For many decades after *Ocean Accident*, courts, parties to transactions, and litigants generally *assumed* the legal propriety of assigning to a successor, in connection with a transfer of assets and liabilities, the right to invoke insurance coverage for losses that had previously occurred — even if those losses were not determined with precision or indeed known, let alone reduced to a judgment.  (See, e.g., May, *Successor's Rights to Insurance Coverage for Predecessors' Preacquisition Activities: Recent Developments* (2005) 40 Tort Trial & Ins. Prac. L.J. 911, 912.)  In large part, the pervasiveness of this practice appears attributable to the widespread acceptance of and deference to *Ocean Accident*, and the prior cases on which it relied.  Indeed, in the decades after *Ocean Accident*, and until the mid-1980s, "courts routinely allowed whoever ended up with the tort liability to enjoy the benefit of insurance coverage that would have applied before the later corporate transaction took place."  (1 Stempel On Insurance Contracts (3d ed. 2014) at p. 3-128 & fn. 409.4, and cited cases.)

More recent experience reveals that *Ocean Accident*'s influence has continued and indeed grown.  (See *Gopher Oil Co. v. American Hardware Mutual Ins. Co.* (Minn.Ct.App. 1999) 588 N.W.2d 756, 763-764 [citing and relying on *Ocean Accident* in holding that "loss

---

[44]    See *ante*, footnote 28.

occurs at the time of contamination"; agreeing that "[a]n assignment of a loss does not expand the risk to cover other activities; it only allows a change in the identity of the insured to reconnect the policy's coverage to the insured loss"; observing that "[t]he great majority of courts follow this distinction between risk and loss and allow an insured to assign a loss" despite a standard consent-to-assignment clause; and commenting that doing otherwise would provide "an insurer . . . the windfall of not having to insure an occurrence that it received premiums for covering"]; *In re ACandS, Inc.* (Bankr. D.Del. 2004) 311 B.R. 36, 41 [permitting assignment of asbestos-related bodily injury claims " 'because an insured's right to proceeds vests at the time of the loss giving rise to the insured's liability' "]; *Elliott v. Liberty Mutual Ins. Co.* (N.D. Ohio 2006) 434 F.Supp.2d 483, 491 [allowing assignment even though a claim had not been reduced to a money judgment and observing that numerous other courts have so held];[45] *Egger v. Gulf Ins. Co.* (Pa. 2006) 903 A.2d 1219, 1223, 1226-1228 [observing that a postloss assignment generally does not "increase the risk to the insurer associated with an undesirable assignee"; finding that "the event that occasioned the liability of [the insurer] was the 'Occurrence' to which the policy applied; i.e., the bodily injury that [the insured] caused" to the underlying plaintiff on a certain date within the policy period; rejecting the insurer's position that a jury verdict is required prior to assignment; and commenting that the insurer's view "confuses loss with the subsequent fixing of a precise amount of damages for that loss"]; *Pilkington North America, Inc. v.*

---

[45] Accord, see also *Century Indemnity Company v. Aero-Motive Co.* (W.D.Mich. 2003) 318 F.Supp.2d 530. Although the court's initial decision did not cite and was inconsistent with *Ocean Accident*, on reconsideration it relied on and quoted from that decision, concluding that "in cases involving occurrence-based liability policies such as those at issue here, when *the event giving rise to the insurer's coverage liability occurs within the policy period and prior to the assignment*, there is no valid reason for not enforcing the assignment." (*Century Indemnity Company v. Aero-Motive Co.* (W.D.Mich., Mar. 12, 2004, No. 1:020-CV-108) 2004 WL 5642427, p. 3, italics added; see *Century Indemnity Company v. Aero-Motive Co.* (W.D.Mich. 2004) 336 F.Supp.2d 739, 744, aff. (6th Cir. 2005) 155 Fed.Appx. 833.)

45

*Travelers Casualty & Surety Co.* (Ohio 2006) 861 N.E.2d 121, 126, 129 [observing that "[o]ur precedent has consistently recognized that the insurer's coverage obligation in an occurrence policy arises at the time of the occurrence"; concluding that "[t]he lack of a specifically defined amount of recovery is not fatal to the determination that a chose exists"; and holding that the right to invoke indemnification coverage under the liability policies had been properly assigned, despite the presence of the consent-to-assignment clauses in the policies, because the losses preceded the assignments]; *In re Ambassador Ins. Co.* (Vt. 2008) 965 A.2d 486, 490-491 [observing that "[m]ost courts and commentators agree that post-loss assignment of payment under an insurance policy is not subject to a consent-to-assignment clause" and holding that under an occurrence-based policy, the insurer's potential liability to indemnify the insured "arose when parties were injured by [the insured's] products. Although the exact amount of [the insurer's] liability is not known because all of the suits against [the insured] have not been reduced to distinct monetary awards, [the insurer's] obligation to insure the risk has not been altered . . . however much [this amount] eventually may be."]; *Viking Pump, Inc. v. Century Indemnity Co.* (Del.Ch. 2009) 2 A.3d 76, 107 [enforcing postloss assignments of rights to invoke coverage under third party liability insurance despite a consent-to-assignment clause and even though at the time of the assignments the amount of the liabilities was unknown, observing that "the mechanism by which the extent of those liabilities would be determined was the same"]; *Illinois Tool Works v. Commerce & Industry Ins. Co.* (Ill.App.Ct. 2011) 962 N.E.2d 1042, 1050, 1055 [enforcing postloss assignment of rights to invoke coverage under third party liability policies to a successor in the face of a consent-to-assignment clause even though the insured's "right to be defended and indemnified by the insurers for qualifying occurrences happening during the policy periods . . . were not yet due at the time of the assignment" and even though the extent of damages caused by the damage resulting in loss may not be known or knowable until long after assignment; and following the " ' "great weight of authority" ' " in holding that a consent-to-assignment clause should be given no effect when

rights to invoke liability insurance coverage were assigned after damage or injury resulting in loss had already occurred]; see also *Narruhn v. Alea London, Ltd*. (S.C. 2013) 745 S.E.2d 90, 94 [discussing and following the general rule, and approving assignment over the insurer's objection, observing that " '[a]fter the loss was incurred, the issue became *not an assignment of the policy*, but the assignment of a chose in action' "].)

We are aware of only one out-of-state exception to this line of authority, and that decision has not been followed by any other jurisdiction.[46]

---

[46]    See *Travelers Casualty & Surety Co. v. United States Filter Corp.* (Ind. 2008) 895 N.E.2d 1172, 1179, 1180 (*Travelers*) (declining to enforce a postloss assignment of rights to invoke coverage under third party liability coverage concerning "occurred but not yet reported losses" and rejecting the majority rule allowing postloss assignment, finding instead that in order to qualify for assignment, "the loss must be identifiable with some precision" and "must be fixed, not speculative").  In the intervening nearly seven years, this aspect of the Indiana Supreme Court's decision has been followed by no out-of-state decision and by only one lower court of that state, in related litigation.  (*Continental Ins. Co. v. Wheelabrator Technologies, Inc*. (Ind.Ct.App. 2011) 960 N.E.2d 157, 163 [describing and enforcing the "narrow 'post-loss exception' carved out by the supreme court"].)

In addition, a few recent cases from minority jurisdictions, employing an approach significantly different from *Henkel*, enforce consent-to-assignment clauses even more strictly than in that case, by failing to recognize *any* postloss exception to those clauses (even, apparently, as to claims that that have been reduced to a money judgment).  Significantly, Hartford does not promote or rely on the analysis in any of these latter cases, and briefly cites them only to counter the public policy assertion (see *post*, pt. III.B.6.) that postloss assignment of claims is necessary in order for corporations to efficiently transact business and evolve.

These minority cases are animated by the view that "freedom of contact" requires consent-to-assignment clauses be rigidly enforced — thereby valuing the contract rights of insurers to enforce such clauses, over the contract rights of parties to contract for transfer of such claims.  Each case, implicitly or explicitly — and without any significant analysis — rejects the majority rule, which as noted generally enforces postloss assignment of claims under third party liability policies.  The cases cited by Hartford are:  *Del Monte Fresh Produce (Hawaii), Inc. v. Fireman's Fund* (Hawaii 2007) 183 P.3d 734, 747 and footnote 15 (enforcing consent-to-assignment clauses without considering whether the assignment occurred after the loss, and peremptorily rejecting the majority rule); *Holloway v. Republic Indemnity Company of America* (Or. 2006) 147 P.3d 329 (declining to enforce postloss assignment of claim under a liability policy, barely acknowledging the contrary view of most jurisdictions, and finding no public policy that would require the court to void the

(*footnote continued on next page*)

5. *California cases construing "loss" in the related context of determining the "trigger of liability"*

The fundamental premise underlying *Ocean Accident* and the cases that have built upon it — that an insured loss occurs or happens *at the time of injury during the policy period*, and well before there might be any judgment or approved settlement for a sum of money — also has been recognized in our own cases addressing related aspects of "long tail" insurance coverage. Although these cases did not concern assignability of a right to invoke policy coverage, the analysis they employed is consistent with the understanding of loss articulated in the overwhelming majority approach described above.

In *Montrose, supra,* 10 Cal.4th 645, a chemical company was sued for personal injuries and property damage. The company had been covered by multiple insurers for numerous consecutive policy periods over many years. One of the later insurers asserted that the precipitating acts giving rise to injury or damage had occurred before its policies had been issued, and accordingly argued that its duty to defend had not been triggered during the period of its own policy. Addressing the point in time at which "injury or damage" that is continuous and occurs during successive policy periods triggers the insurer's duty to defend under occurrence-based CGL policies, we explained that the insurer's duty arises when there is a *potential* for coverage, and even though there ultimately may be no duty to indemnify. (*Id.*, at p. 659, fn. 9.) We considered four possible trigger-of-

(*footnote continued from previous page*)

clause); *In re Katrina Canal Breaches Litigation* (La. 2011) 63 So.3d 955, 959 (acknowledging the overwhelming majority rule and the same prior rule in La., but concluding that an intervening statute protects the "freedom of contract" and strictly bars assignment, even regarding claims under first party property policies); and also *Keller Foundations, Inc. v. Wausau Underwriters Ins. Co.* (5th Cir. 2010) 626 F.3d 871, 874-878 (acknowledging the overwhelming majority rule, but applying Tex. law, enforcing consent-to-assignment provisions in all circumstances). Academic commentators have subjected cases such as these to scathing criticism. (1 Stempel on Insurance Contracts, *supra*, § 3.15[D], pp. 3-130 to 3-132 [analyzing *Holloway, supra,* 147 P.3d 329].)

coverage periods: (1) the date of initial exposure to the injury-causing event or conditions; (2) the date that an injury "in fact" occurred; (3) the date that injury became manifest; and, the broadest category, (4) "over the continuous period *from exposure through manifestation and beyond.*" (*Id.*, at pp. 673-674, italics added.) We rejected the insurer's position that manifestation (the latest possible trigger time) should be used, and determined that the fourth option was the most appropriate under the words of the CGL policies and the relevant majority-rule cases. (*Id.*, at p. 686.) Accordingly, we concluded that bodily injury and property damage that is "continuous or progressively deteriorating" (*id.*, at p. 654 and passim) throughout successive policy periods is covered by all insurers' policies in effect during those periods even though, we acknowledged, the injuries at issue in such cases are " 'latent . . . , unknown and unknowable' " at the time the insurance policies were issued. (*Id.*, at p. 682.)

In the process of reaching these determinations concerning the trigger of the insurers's duty to defend, we repeatedly employed and equated the term "loss," *not* with a judgment or settlement for a sum of money, as Hartford urges we should now, but as synonymous with occurrence of bodily injury and property damage — as Fluor-2 has argued we should. (See *Montrose, supra,* 10 Cal.4th at p. 654 [defining the relevant "losses" as the "continuous or progressively deteriorating bodily injury and property damage"]; pp. 679-680 [speaking of " '[manifestation of] the actual loss' " (brackets in original) and describing the "insurer's obligation to indemnify an insured for manifested losses"] (italics omitted); see also pp. 689-693 [rejecting argument that the " 'loss-in-progress rule (sometimes also referred to as the known loss rule)" rendered the underlying injuries and damages uninsurable]; *id.*, conc. opn. of Baxter, J., at p. 697 ["In the third party context, the relevant risk is the insured's act or omission, and the resulting *damage, injury, or loss* to another, which together form the basis of legal liability . . . ."] (italics added).) Plainly, in *Montrose*,

we did not contemplate that loss occurred only upon judgment or approved settlement for a sum of money.[47]

In *State of California v. Continental Ins. Co.* (2012) 55 Cal.4th 186 (*Continental*), we extended our analysis and holding in *Montrose* to cover not only the duty to defend, but also the duty to indemnify. And in the process we once again equated the term "loss," *not* with a judgment or settlement for a sum of money, but as synonymous with occurrence of bodily injury and property damage. We concluded that in connection with a "long-tail" environmental cleanup suit, each insurer was responsible, subject to policy limits, for the total amount of the insured's covered liability concerning continuous property damage.[48] We explained that our determination "resolves the question of insurance coverage as equitably as possible, given the immeasurable aspects of a long-tail injury. It also comports with the parties' reasonable expectations, in that the insurer reasonably expects to pay for property damage occurring during a long-tail loss it covered, but only up to its policy limits,

---

[47]    Our interpretation of the term "loss" in *Montrose* was consistent with insurance industry publications from the mid-1960s authored by officials associated with the National Bureau of Casualty Underwriters — the insurer entity that drafted the standardized CGL language employed in third party liability policies — reflecting industry understanding that the term "loss" is essentially synonymous with personal injury or property damage. These publications acknowledge that the definition of the term "occurrence" in the standard policy "serves to *identify the time of loss* for application of coverage" concerning injury that "take[s] place during the policy period." (See Nachman, *The New Policy Provisions for General Liability Insurance* (1965) The Annals 197, 200; accord, Elliott, *The New Comprehensive General Liability Policy,* in Liability Insurance Disputes (PLI, Schreibner, edit., 1968) p. 12-5; see also Obrist, *New Comprehensive General Liability Insurance Policy* (Defense Research Inst. 1966) 5, 6 [observing that some "injuries take place over an extended period before they become evident as in slow ingestion of foreign substances" and that "[u]nder the new policy, coverage applies when the bodily injury or property damage occurs during the policy period"].)

[48]    Moreover, we determined, the insured was entitled to "stack" policy limits for all applicable policies. We held that "the policies at issue obligate the insurers to pay all sums for property damage . . . as long as some of the continuous property damage occurred while each policy was 'on the loss.' " (*Continental, supra*, 55 Cal.4th at p. 200.)

while the insured reasonably expects indemnification for the time periods in which it purchased insurance coverage." (*Id.*, at p. 201.) In reaching these determinations we repeatedly employed the term "loss" consistently with the majority cases described above. (See, e.g., *Continental, supra,* 55 Cal.4th at pp. 191 [speaking of the policy period "during the property damage itself"], 197 ["as long as the policyholder is insured at some point during the continuing damage period, the insurers' indemnity obligations persist until the loss is complete, or terminates"], 198 [circumstance "that all policies were covering the risk at some point during the property loss is enough to trigger the insurers' indemnity obligation"].)[49]

6. *Application of these principles to interpretation of section 520*

The recognized rationale for enforcing a consent-to-assignment clause is to protect an insurer from bearing a risk or burden relating to a loss that is greater than what it agreed to undertake when issuing a policy. (E.g., *Bergson, supra,* 38 Cal. 541; *Greco, supra,* 191 Cal.App.2d at p. 682; *Illinois Tool Works, supra,* 962 N.E.2d at p. 1053.) It is undisputed that an insured may not transfer *the policy itself* to another without the insurer's consent, and in this sense all parties agree. But the "postloss exception" to the general rule restricting assignability, recognized in the many cases discussed earlier and codified in section 520, is itself a venerable rule that arose from experience in the world of commerce. The rule has been acknowledged as contributing to the efficiency of business by minimizing transaction costs and facilitating economic activity and wealth enhancement:

---

[49] The same observations about interpretation of the word "loss" apply regarding other California appellate cases. (See *Westoil Terminals Co. v. Harbor Ins. Co.* (1999) 73 Cal.App.4th 634, 641-642 [observing that with regard to toxic discharge, "loss occurred during the policies' periods" well before the transfer of the claims approximately 16 years later]; *Employers Ins. Co. v. Travelers Indemnity Co.* (2006) 141 Cal.App.4th 398, 405 [observing that with regard to toxic discharge, "[a]t the time of loss, each insurer had a potential obligation to defend and indemnify" the insured].)

51

"[A] major rationale for commercial insurance is to facilitate economic activity and growth by providing risk management protection for economic actors. . . . In the modern American economy, mergers, acquisitions, and sales are part of corporate life. For the most part, economists approve of this activity because it allows the marketplace to allocate resources to their most profitable uses. To the extent that insurance protection (for past but possibly unknown losses) may be more freely assigned as part of corporate recombinations, this lowers transaction costs and facilitates economic activity and wealth enhancement. Consequently, the general rule permitting post-loss assignment is a good rule — which is why the courts have crafted it over the years even though it appears to contradict the clear text of many insurance policies and the courts' expressed fidelity to contract language. The post-loss exception to the general rule of restricted insurance assignability is a venerable rule borne of experience and practicality. That is why courts have adopted it." (1 Stempel on Insurance Contracts, *supra*, § 3.159[D], pp. 3-125 to 3-126.) The postloss rule prevents an insurer from engaging in unfair or oppressive conduct — namely, precluding assignment of an insured's right to invoke coverage under a policy attributable to past time periods for which the insured had paid premiums.

In view of the history described above, and consistently with the California cases touching on the subject (including *Continental, supra,* 55 Cal.4th 186; *Montrose, supra,* 10 Cal.4th 645; *Comunale, supra,* 50 Cal.2d 645; *Bergson, supra,* 38 Cal. 541; and *Greco, supra,* 191 Cal.App.2d 674) we conclude that the phrase "after a loss has happened" in section 520 should be interpreted as referring to a loss sustained by a third party that is covered by the insured's policy, and for which the insured may be liable. We conclude that the statutory phrase does not contemplate that there need have been a money judgment or approved settlement before such a claim concerning that loss may be assigned without the insurer's consent. Only this interpretation of the statute's language barring veto of assignment by an insurer honors the clear intent demonstrated by the history of section 520 to avoid any "unjust" or "grossly oppressive" enforcement of a consent-to-assignment

52

clause. (See *ante*, pt. III.B.1.) Specifically, as applied to this case and similar circumstances, only such an interpretation protects the ability of an insured, in the course of transferring assets and liabilities to another business entity in connection with a corporate sale or reorganization, to assign rights to claim defense and indemnification coverage provided by prior and existing insurance policies concerning the business's previous conduct. Because any such new business entity typically will assume both the assets and the liabilities of the prior business entity, the new business entity will understandably expect to obtain the rights to claim defense and indemnification coverage for such liabilities triggered during the policy period. If the insurer were able to prevent its insured from assigning rights to assert such claims unless first reduced to a money judgment or approved settlement, it would effectively exert precisely the type of unjust and oppressive pressure on the insured that the early decisions, California Code Commissioners, and Legislature sought to foreclose.

  7. *Challenges to this interpretation of section 520*

    a. *"Loss" as used in section 108*

  Hartford asserts that our interpretation of the word "loss" in section 520 conflicts with the proper interpretation of that same word in a corresponding section, section 108, which as noted earlier was adopted along with section 520 in the general rules division of the Insurance Code in 1935. Section 108 provides: "Liability insurance *includes*: [¶] (a) *Insurance against loss resulting from liability for injury*, fatal or nonfatal, suffered by any natural person, or resulting from liability for damage to property, or property interests of others but does not include worker's compensation, common carrier liability, boiler and machinery, or team and vehicle insurance."

  Hartford argues that in the context of section 108, "loss" must be interpreted as arising only after the underlying matter is first reduced to a judgment or approved settlement for a sum of money due. Focusing on the italicized words, and especially the phrase "loss resulting from liability," Hartford connects this language of section 108 to section 520's

53

reference to permissible assignment "after a loss has happened." Hartford reasons that under *both* statutes, " 'Loss' does not occur simultaneous with, but rather must 'result from,' and occur subsequent to, the third party injury. In the way that the Insurance Code contemplated liability insurance, then, . . . 'loss' arises, not from third party injury itself, but from 'liability' which, in turn, may result from injury." It follows, Hartford argues, that "the insured's liability must be established before the insurer is obligated to indemnify the loss," and there can be "no claim against the insurer under an indemnity policy *until the insured is held liable* because *being held liable is the necessary precondition to 'loss.' ' "* (Italics added.) We disagree.

It is true that an insurer's obligation to actually "cut a check" and *transfer funds* in performance of its duty to indemnify does not arise until there is a judgment or approved settlement for a sum of money due. (*Montrose, supra,* 10 Cal.4th 645, 659, fn. 9 ["[t]he obligation to indemnify . . . arises when the insured's underlying liability is established"].) In this respect, Hartford is correct.

But contrary to Hartford's view, as observed in *Ocean Accident*, *supra*, 100 F.2d 441, 446, liability can arise simultaneously with loss and injury — at the same time someone causes a compensable injury — and not only when someone loses a lawsuit. There is no indication from section 108 or section 520, or other related contemporaneous statutes proposed by the California Code Commissioners and enacted by the 1935 California Legislature, that anyone understood the term "loss" *as used in section 520* to have the meaning that Hartford proposes now — as arising only upon imposition of liability by entry of a judgment or approved settlement for a sum of money.[50]

---

[50] To support its contrary view Hartford cites *Day v. City of Fontana* (2001) 25 Cal.4th 268, in which we quoted multiple dictionary definitions of liability insurance, one of which, Hartford asserts, is very similar to that in section 108: " '[I]nsurance against loss resulting from liability for injury or damage to the persons or property of others.' " (*Day, supra*, at p. 278, fn. 4.) In that passage, however, we were simply distinguishing general liability insurance from automobile insurance, and our brief citation to one of various dictionary

(*footnote continued on next page*)

b. *Derivation from the 1872 Civil Code*

Hartford's amicus curiae Stonewall, citing *Li v. Yellow Cab Co.* (1975) 13 Cal.3d 804, 813-816, and venerable secondary authorities, asserts that with regard to statutes tracing back to the original Civil Code of 1872, the common law is expected to evolve and differ from — and, as appropriate, even control over — those original Civil Code provisions. Stonewall argues the same approach should apply here, and indeed, it urges that to the extent this court's common law decision in *Henkel* differs from section 520, our decision is itself " 'controlling' over the Civil Code, not the other way around." Reliance on this aspect of *Li*'s analysis is inapt in this setting, however.

This court in *Henkel* did not address section 520 and did not consider the language or the legislative history or purpose of that statute. We did not explore the wealth of judicial authorities, discussed earlier in this memorandum, bearing on the proper interpretation of section 520. Now, we are cognizant of not only section 520 and related authorities, but also of the subsequent common law decisions of other courts, virtually all of which are at odds with our key holding in *Henkel*.[51] Nor has *Henkel* fared better in scholarly publications or

---

(*footnote continued from previous page*)

definitions to support that distinction cannot plausibly be understood as a pronouncement about when a "loss" occurs for purposes of general liability insurance, let alone when assignment after a loss is permissible. *California State Auto. Assn. Inter-Ins. Bureau v. Superior Court* (1990) 50 Cal.3d 658, on which Hartford also relies to support its assertion that "an enforceable claim arises against a liability insurer not when injury occurs, but when the insured is held liable for that injury," is similarly inapt. In that case, in which we addressed the viability of a (disapproved) action against an insurance company for unfair practices, we simply applied the requirement, clearly established in our prior cases, that there must be a " 'judicial determination of the insured's liability' " as a condition of such a lawsuit. (*California State Auto. Assn., supra*, at p. 662, italics omitted.) Again, we intimated nothing about when assignment after a loss is permissible.

[51] Of the numerous cases cited *ante*, part III.B.4., all but one either implicitly or explicitly disagree with *Henkel*, and follow the majority common law rule that under third party liability policies, "loss" arises at the time of the "occurrence" that results in injury or damage, even though the dollar amount of that loss may be unknown and unknowable until

(*footnote continued on next page*)

practice guides.**52**  Under all of these circumstances, we are not persuaded that we should rely upon *Henkel* in determining the appropriate interpretation of section 520.  With an understanding of the history of section 520 and its Civil Code predecessor, as well as of the reality of insurance practice, there is no basis on which to discount the primacy of the statute or to interpret it contrary to our present understanding of the common law.

---

(*footnote continued from previous page*)

much later, and allow assignment of the right to invoke coverage at any time after that loss. Even the 2008 decision of the Indiana Supreme Court in *Travelers, supra*, 895 N.E.2d 1172*, which came closest to following *Henkel*, *supra*, 29 Cal.4th 934, carefully and explicitly avoided endorsing its key holding that postloss assignment of a claim cannot occur until the claim has been reduced to a sum of money due (see *Travelers* at pp. 1180-1181) — and as observed *ante*, footnote 46, the *Travelers* case has not been followed by any out-of-state decision.

**52**      The *Henkel* decision has not been well received.  (See, e.g., Scales, *Following Form: Corporate Succession and Liability Insurance* (2011) 60 DePaul L.Rev. 573, 581-582 [agreeing with earlier criticisms, and asserting that the opinion "reflects an incompletely rationalized approach, partly because it reached some wrong conclusions on the discrete problems before it, but more important because it treated them discretely" — by giving excessive weight to the insurer's contract rights at the expense of the insured's contract rights, and insufficient weight to related corporate law and tort principles].)

The decision has met a similar fate in practice guides.  (See, e.g., 1 Stempel on Insurance Contracts, *supra*, § 3.15[D], pp. 3-118.1 through 3-127 [extensively critiquing *Henkel* in six respects and concluding that the case "may become an outlier decision apart from the mainstream"]; Croskey et al., Cal. Practice Guide:  Insurance Litigation (The Rutter Group 2013) ¶ 7:430.7, p. 7A-164 [observing that because "substantial injuries had allegedly occurred *prior* to the assignment to Henkel, the transfer had no effect on the insurer's coverage risk and its consent arguably should not have been necessary"]; DiMugno & Glad, California Insurance Law Handbook (2014) § 44:6, p. 1232 [asserting that the decision is "difficult to reconcile" with *Montrose, supra*, 10 Cal.4th 645, and that "[s]uccessor corporations are likely to find it exceedingly difficult, if not impossible, to purchase insurance for injuries that have already occurred before the successor's purchase of the business" and this will "inhibit[] corporate reorganization or sale"]; 1 Cal. Liability Insurance Practice:  Claims & Litigation (Cont.Ed.Bar 2014) § 2.2A, p. 2-3 [describing *Henkel*'s holding and asserting:  "It is clear that the insurers owe *someone* a duty of defense and indemnification under their policies for injuries occurring while they were in effect. Permitting the successor to receive the policy benefits does not increase the insurers' risk."].)

### c. *The relative obscurity of the statute*

We also reject the related suggestion that section 520 is entitled to less judicial respect, or that we should decline to construe it now as we would had it been brought to our attention earlier, merely because the statute was assertedly overlooked until a few years after our decision in *Henkel*. As an initial matter, we observe that, contrary to Hartford's contention that section 520 has been ignored — having been cited in only one case before being raised in the present litigation in 2011 — the statute and its predecessor were indeed noted and described in secondary sources between 1924 and 2005. (See *ante*, fn. 32.) In any event, we perceive a simple explanation for any prior relative obscurity or absence of express reliance on section 520 in any published case: Until the *Henkel* litigation, it appeared generally unnecessary for litigants or courts to cite or rely upon it.

In fact, the parties in this matter — including, significantly, Hartford itself — for decades implicitly operated under the influence and understanding of *Ocean Accident, supra*, 100 F.2d 441, and the widely accepted industry practice of allowing postloss assignment of rights to invoke liability coverage. As observed *ante*, at page 7 and footnote 5, following the original Fluor's assignment of assets and liabilities to Fluor-2, between 2002 and 2008 Hartford treated Fluor-2 as entitled to invoke coverage relating to third party injuries that had predated the assignment, and, indeed, during those seven years charged Fluor-2 nearly $5 million in "retrospective premiums" under the assigned insurance policies. It was not until 2009 — six years after the decision in *Henkel* — that Hartford for the first time asserted that assignment of claims for defense and indemnification coverage under its policies had been improperly made without its consent and hence was ineffective. This conduct further demonstrates that until insurers recently began to disallow and contest such assignments, there was little cause for insureds to think about, much less rely on, section

57

520.[53]  The circumstance that the statute has until very recently remained relatively obscure affords no basis to decline to construe and apply it now as we would have had it been brought to our attention or had we become aware of it earlier.

## IV.  *Stare Decisis*

Hartford suggests that principles of stare decisis militate against overruling our key holding in *Henkel*.  Of course, "a rule once declared in an appellate decision constitutes a precedent that should normally be followed . . . in cases involving the same problem." (9 Witkin, Cal. Proc. (5th ed. 2008) Appeal, § 481, pp. 540-541.)  As Witkin observes, however, courts have articulated reasons for overruling a prior decision — among them (1) that it overlooked an existing statute; and (2) that it is contrary to the general law as reflected in other cases, including out-of state cases before and after the decision.  (*Id*., § 519, p. 587 et seq.; *id*., § 530, p. 600 et seq.)  Although Fluor-2 and its amici curiae assert both grounds as reasons for overruling *Henkel*, it is sufficient to rely on the first, which Witkin aptly characterizes as "[p]robably the strongest reason" for not following a prior decision.  (*Id*., at p. 587.)

In *Henkel,* which as noted involved a postloss assignment of rights to invoke coverage under a third party liability policy, we rendered a common law-based holding, concluding that such an assignment is subject to consent by the insurer unless "the benefit has been reduced to a claim for money due or to become due." (*Henkel, supra*, 29 Cal.4th at p. 945.)  We now recognize that this determination, reached without consideration or analysis of section 520, conflicts with the rule prescribed by that statute.  In analogous

---

[53]     Of course, this still does not explain why section 520 was not discussed by the parties — especially the plaintiff or its amicus curiae — in *Henkel* itself.  And yet as observed *post*, part IV, such omissions occasionally happen.  This reminds us that even with access to computer research technology, any human enterprise cannot be perfect; and that it is better that wisdom, or at least controlling authority, come to our attention late, rather than not at all.  (Cf. *Smith v. Anderson* (1967) 67 Cal.2d 635, 646 (conc. opn. of Mosk, J.) [" 'Wisdom too often never comes, and so one ought not to reject it merely because it comes late.' "], quoting from *Wolf v. Colorado* (1949) 338 U.S. 25, 47 (dis. opn. of Rutledge, J.).)

circumstances we have overruled our own prior authority. (*Martin v. Palmer Union Oil Co.* (1920) 184 Cal. 386, 389 [overruling a seven-year-old decision that overlooked a controlling statute, observing that our earlier opinion "inadvertently appl[ied] . . . principles to a case where they were not applicable because of a positive statutory provision to the contrary"]; *Alferitz v. Borgwardt* (1899) 126 Cal. 201, 207-209 [overruling our prior case that failed to note and apply the controlling statute].)  In light of section 520, the *Henkel* decision is overruled to the extent it is inconsistent with this opinion's analysis.

## V.  *Conclusion*

For the reasons set forth, Insurance Code section 520 applies to third party liability insurance.  Under that provision, after personal injury (or property damage) resulting in loss occurs within the time limits of the policy, an insurer is precluded from refusing to honor an insured's assignment of the right to invoke defense or indemnification coverage regarding that loss.  This result obtains even without consent by the insurer — and even though the dollar amount of the loss remains unknown or undetermined until established later by a judgment or approved settlement.  Our contrary conclusion announced in *Henkel Corp. v. Hartford Accident & Indemnity Co., supra*, 29 Cal.4th 934, is overruled to the extent it conflicts with this controlling statute and this opinion's analysis.  The matter is remanded to the Court of Appeal for proceedings consistent with this opinion.

**CANTIL-SAKAUYE, C. J.**


**WE CONCUR:**

**WERDEGAR, J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**

59

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Fluor Corporation v. Superior Court
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 208 Cal.App.4th 1506
**Rehearing Granted**
_____

**Opinion No.** S205889
**Date Filed:** August 20, 2015
_____

**Court:** Superior
**County:** Orange
**Judge:** Ronald L. Bauer
_____

**Counsel:**

Latham & Watkins, G. Andrew Lundberg, Brook B. Roberts and John M. Wilson for Petitioner.

Alok K. Gupta; Reed Smith, James C. Martin, David H. Halbreich and Traci S. Rea for Henry Company LLC and Parsons Corporation as Amici Curiae on behalf of Petitioner.

Dickstein Shapiro and Kirk A. Pasich for United Poliyholders as Amici Curiae on behalf of Petitioner.

Perkins Coie and Timothy L. Alger for Alpha Appalachia Holdings, Inc., as Amicus Curiae on behalf of Petitioner.

Kamala D. Harris, Attorney General, Susan Duncan Lee, Acting State Solicitor General, Kathleen A. Kenealy, Chief Assistant Attorney General, Paul Gifford, Assistant Attorney General, Joyce E. Hee and Anne Michelle Burr, Deputy Attorneys General, for The California Insurance Commissioner as Amicus Curiae on behalf of Petitioner.

No appearance for Respondent.

Horvitz & Levy, Jason R. Litt, John A. Taylor, Jr.; Gaims, Weil, West & Epstein, Alan Jay Weil, Jeffrey B. Ellis; Shipman & Goodwin, James P. Ruggeri and Joshua D. Weinberg for Real Party in Interest.

Troutman Sanders, Thomas H. Prouty and Patrick F. Hofer for Stonewall Insurance Company as Amicus Curiae on behalf of Real Party in Interest.

Gordon & Rees, Dave C. Capell and Dawn N. Valentine for Complex Insurance Claims Litigation Association and America Insurance Association as Amicus Curiae on behalf of Real Party in Interest.

1

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

John M. Wilson
Latham & Watkins
12670 High Bluff Drive
San Diego, CA  92130
(858) 523-5400

John A. Taylor, Jr.
Horvitz & Levy
15760 Ventura Boulevard, 18th Floor
Encino, CA  91436-3000
(818) 995-0800